*505 Justice Scalia
delivered the opinion of the Court, except as to Part III-E.
Federal law prohibits the broadcasting of “any . . . indecent . . . language,” 18 U. S. C. § 1464, which includes expletives referring to sexual or excretory activity or organs, see FCC v. Pacifica Foundation, 438 U. S. 726 (1978). This case concerns the adequacy of the Federal Communications Commission’s explanation of its decision that this sometimes forbids the broadcasting of indecent expletives even when the offensive words are not repeated.
I. Statutory and Regulatory Background
The Communications Act of 1934,48 Stat. 1064,47 U. S. C. § 151 et seq. (2000 ed. and Supp. V), established a system of *506 limited-term broadcast licenses subject to various “conditions” designed “to maintain the control of the United States over all the channels of radio transmission,” § 301 (2000 ed.). Almost 28 years ago we said that “[a] licensed broadcaster is granted the free and exclusive use of a limited and valuable part of the public domain; when he accepts that franchise it is burdened by enforceable public obligations.” CBS, Inc. v. FCC, 453 U. S. 367, 395 (1981) (internal quotation marks omitted).
One of the burdens that licensees shoulder is the indecency ban — the statutory proscription against “utter[ingj any obscene, indecent, or profane language by means of radio communication,” 18 U. S. C. § 1464 — which Congress has instructed the Commission to enforce between the hours of 6 a.m. and 10 p.m. Public Telecommunications Act of 1992, § 16(a), 106 Stat. 954, note following 47 U. S. C. § 303.[1] Congress has given the Commission various means of enforcing the indecency ban, including civil fines, see § 503(b)(1), and license revocations or the denial of license renewals, see §§ 309(k), 312(a)(6).
The Commission first invoked the statutory ban on indecent broadcasts in 1975, declaring a daytime broadcast of George Carlin's “Filthy Words” monologue actionably indecent. In re Citizen’s Complaint Against Pacifica Foundation Station WBAI (FM), 56 F. C. C. 2d 94. At that time, the Commission announced the definition of indecent speech that it uses to this day, prohibiting “language that describes, *507 in terms patently offensive as measured by contemporary community standards for the broadcast medium, sexual or excretory activities and organs, at times of the day when there is a reasonable risk that children may be in the audience.” Id., at 98.
In FCC v. Pacifica Foundation, supra, we upheld the Commission’s order against statutory and constitutional challenge. We rejected the broadcasters’ argument that the statutory proscription applied only to speech appealing to the prurient interest, noting that “the normal definition of ‘indecent’ merely refers to nonconformance with accepted standards of morality.” Id., at 740. And we held that the First Amendment allowed Carlin’s monologue to be banned in light of the “uniquely pervasive presence” of the medium and the fact that broadcast programming is “uniquely accessible to children.” Id., at 748-749.
In the ensuing years, the Commission took a cautious, but gradually expanding, approach to enforcing the statutory prohibition against indecent broadcasts. Shortly after Pacifica, 438 U. S. 726, the Commission expressed its “intension] strictly to observe the narrowness of the Pacifica holding,” which “relied in part on the repetitive occurrence of the ‘indecent’ words” contained in Carlin’s monologue. In re Application of WGBH Educ. Foundation, 69 F. C. C. 2d 1250, 1254, ¶ 10 (1978). When the full Commission next considered its indecency standard, however, it repudiated the view that its enforcement power was limited to “deliberate, repetitive use of the seven words actually contained in the George Carlin monologue.” In re Pacifica Foundation, Inc., 2 FCC Red. 2698, 2699, ¶ 12 (1987). The Commission determined that such a “highly restricted enforcement standard . . . was unduly narrow as a matter of law and inconsistent with [the Commission’s] enforcement responsibilities under Section 1464.” In re Infinity Broadcasting Corp. of Pa., 3 FCC Red. 930, ¶ 5 (1987). The Court of Appeals for the District of Columbia Circuit upheld this *508 expanded enforcement standard against constitutional and Administrative Procedure Act challenge. See Action for Children’s Television v. FCC, 852 F. 2d 1332 (1988) (R. Ginsburg, J.), superseded in part by Action for Children’s Television v. FCC, 58 F. 3d 654 (1995) (en banc).
Although the Commission had expanded its enforcement beyond the “repetitive use of specific words or phrases,” it preserved a distinction between literal and nonliteral (or “expletive”) uses of evocative language. In re Pacifica Foundation, Inc., 2 FCC Red., at 2699, ¶13. The Commission explained that each literal “description or depiction of sexual or excretory functions must be examined in context to determine whether it is patently offensive,” but that “deliberate and repetitive use ... is a requisite to a finding of indecency” when a complaint focuses solely on the use of nonliteral expletives. Ibid.
Over a decade later, the Commission emphasized that the “full context” in which particular materials appear is “critically important,” but that a few “principal” factors guide the inquiry, such as the “explicitness or graphic nature” of the material, the extent to which the material “dwells on or repeats” the offensive material, and the extent to which the material was presented to “pander,” to “titillate,” or to “shock.” In re Industry Guidance on Commission’s Case Law Interpreting 18 U. S. C. §1464 and Enforcement Policies Regarding Broadcast Indecency, 16 FCC Rcd. 7999, 8002, ¶ 9, 8003, ¶ 10 (2001) (emphasis deleted). “No single factor,” the Commission said, “generally provides the basis for an indecency finding,” but “where sexual or excretory references have been made once or have been passing or fleeting in nature, this characteristic has tended to weigh against a finding of indecency.” Id., at 8003, ¶ 10,8008, ¶ 17.
In 2004, the Commission took one step further by declaring for the first time that a nonliteral (expletive) use of the F- and S-Words could be actionably indecent, even when the word is used only once. The first order to this effect dealt *509 with an NBC broadcast of the Golden Globe Awards, in which the performer Bono commented, “ ‘[T]his is really, really, f***ing brilliant.’ ” In re Complaints Against Various Broadcast Licensees Regarding Their Airing of “Golden Globe Awards” Program, 19 FCC Red. 4975, 4976, n. 4 (2004) (Golden Globes Order). Although the Commission had received numerous complaints directed at the broadcast, its enforcement bureau had concluded that the material was not indecent because “Bono did not describe, in context, sexual or excretory organs or activities and ... the utterance was fleeting and isolated.” Id., at 4975-4976, ¶ 3. The full Commission reviewed and reversed the staff ruling.
The Commission first declared that Bono’s use of the F-Word fell within its indecency definition, even though the word was used as an intensifier rather than a literal descriptor. “[G]iven the core meaning of the ‘F-Word,’” it said, “any use of that word . . . inherently has a sexual connotation.” Id., at 4978, ¶8. The Commission determined, moreover, that the broadcast was “patently offensive” because the F-Word “is one of the most vulgar, graphic and explicit descriptions of sexual activity in the English language,” because “[i]ts use invariably invokes a coarse sexual image,” and because Bono’s use of the word was entirely “shocking and gratuitous.” Id., at 4979, ¶ 9.
The Commission observed that categorically exempting such language from enforcement actions would “likely lead to more widespread use.” Ibid. Commission action was necessary to “safeguard the well-being of the nation’s children from the most objectionable, most offensive language.” Ibid. The order noted that technological advances have made it far easier to delete (“bleep out”) a “single and gratuitous use of a vulgar expletive,” without adulterating the content of a broadcast. Id., at 4980, ¶ 11.
The order acknowledged that “prior Commission and staff action [has] indicated that isolated or fleeting broadcasts of the ‘F-Word’ . . . are not indecent or would not be acted *510 upon.” It explicitly ruled that “any such interpretation is no longer good law.” Ibid., ¶ 12. It “clarified]... that the mere fact that specific words or phrases are not sustained or repeated does not mandate a finding that material that is otherwise patently offensive to the broadcast medium is not indecent.” Ibid. Because, however, “existing precedent would have permitted this broadcast,” the Commission determined that “NBC and its affiliates necessarily did not have the requisite notice to justify a penalty.” Id., at 4981-4982, ¶ 15.
II. The Present Case
This case concerns utterances in two live broadcasts aired by Fox Television Stations, Inc., and its affiliates prior to the Commission’s Golden Globes Order. The first occurred during the 2002 Billboard Music Awards, when the singer Cher exclaimed, “I’ve also had critics for the last 40 years saying that I was on my way out every year. Right. So f*** 'em.” Brief for Petitioners 9. The second involved a segment of the 2008 Billboard Music Awards, during the presentation of an award by Nicole Richie and Paris Hilton, principals in a Fox television series called “The Simple Life.” Ms. Hilton began their interchange by reminding Ms. Richie to “watch the bad language,” but Ms. Richie proceeded to ask the audience, “Why do they even call it ‘The Simple Life?’ Have you ever tried to get cow s*** out of a Prada purse? It’s not so f***ing simple.” Id., at 9-10. Following each of these broadcasts, the Commission received numerous complaints from parents whose children were exposed to the language.
On March 15, 2006, the Commission released “Notices of Apparent Liability” for a number of broadcasts that the Commission deemed actionably indecent, including the two described above. In re Complaints Regarding Various Television Broadcasts Between Feb. 2,2002 and Mar. 8,2005, 21 FCC Red. 2664 (2006). Multiple parties petitioned the Court of Appeals for the Second Circuit for judicial review of *511 the order, asserting a variety of constitutional and statutory challenges. Since the order had declined to impose sanctions, the Commission had not previously given the broadcasters an opportunity to respond to the indecency charges. It therefore requested and obtained from the Court of Appeals a voluntary remand so that the parties could air their objections. 489 F. 3d 444, 453 (2007). The Commission’s order on remand upheld the indecency findings for the broadcasts described above. See In re Complaints Regarding Various Television Broadcasts Between Feb. 2, 2002, and Mar. 8, 2005, 21 FCC Red. 13299 (2006) (Remand Order).
The order first explained that both broadcasts fell comfortably within the subject-matter scope of the Commission’s indecency test because the 2003 broadcast involved a literal description of excrement and both broadcasts invoked the “F-Word,” which inherently has a sexual connotation. Id., at 13304, ¶ 16,13323, ¶ 58. The order next determined that the broadcasts were patently offensive under community standards for the medium. Both broadcasts, it noted, involved entirely gratuitous uses of “one of the most vulgar, graphic, and explicit words for sexual activity in the English language.” Id., at 13305, ¶ 17, 13324, ¶ 59. It found Ms. Richie’s use of the “F-Word” and her “explicit description of the handling of excrement” to be “vulgar and shocking,” as well as to constitute “pandering,” after Ms. Hilton had playfully warned her to “‘watch the bad language.’” Id., at 13305, ¶ 17. And it found Cher’s statement patently offensive in part because she metaphorically suggested a sexual act as a means of expressing hostility to her critics. Id., at 13324, ¶60. The order relied upon the “‘critically important’ ” context of the utterances, id., at 13304, ¶ 15, noting that they were aired during prime-time awards shows “designed to draw a large nationwide audience that could be expected to include many children interested in seeing their favorite music stars,” id., at 13305, ¶ 18,13324, ¶ 59. Indeed, *512 approximately 2.5 million minors witnessed each of the broadcasts. Id., at 13306, ¶ 18,13326, ¶ 65.
The order asserted that both broadcasts under review would have been actionably indecent under the staff rulings and Commission dicta in effect prior to the Golden Globes Order — the 2003 broadcast because it involved a literal description of excrement, rather than a mere expletive, because it used more than one offensive word, and because it was planned, 21 FCC Red., at 13307, ¶ 22; and the 2002 broadcast because Cher used the F-Word not as a mere intensifier, but as a description of the sexual act to express hostility to her critics, id., at 13324, ¶ 60. The order stated, however, that the pre-Golden Globes regime of immunity for isolated indecent expletives rested only upon staff rulings and Commission dicta, and that the Commission itself had never held “that the isolated use of an expletive . . . was not indecent or could not be indecent,” 21 FCC Red., at 13307, ¶ 21. In any event, the order made clear, the Golden Globes Order eliminated any doubt that fleeting expletives could be action-ably indecent, 21 FCC Red., at 13308, ¶ 23, 13325, ¶ 61, and the Commission disavowed the bureau-level decisions and its own dicta that had said otherwise, id., at 13306-13307, ¶¶ 20, 21. Under the new policy, a lack of repetition “weights] against a finding of indecency,” id., at 13325, ¶ 61, but is not a safe harbor.
The order explained that the Commission’s prior “strict dichotomy between ‘expletives’ and ‘descriptions or depictions of sexual or excretory functions’ is artificial and does not make sense in light of the fact that an ‘expletive’s’ power to offend derives from its sexual or excretory meaning.” Id., at 13308, ¶ 23. In the Commission’s view, “granting an automatic exemption for ‘isolated or fleeting’ expletives unfairly forces viewers (including children)” to take “ ‘the first blow’ ” and would allow broadcasters “to air expletives at all hours of a day so long as they did so one at a time.” Id., at 13309, ¶ 25. Although the Commission determined that Fox *513 encouraged the offensive language by using suggestive scripting in the 2003 broadcast, and unreasonably failed to take adequate precautions in both broadcasts, id., at 13311-13314, ¶¶ 31-37, the order again declined to impose any forfeiture or other sanction for either of the broadcasts, id., at 13321, ¶ 53, 13326, ¶66.
Fox returned to the Second Circuit for review of the Remand Order, and various intervenors including CBS, NBC, and ABC joined the action. The Court of Appeals reversed the agency’s orders, finding the Commission’s reasoning inadequate under the Administrative Procedure Act. 489 F. 3d 444. The majority was “skeptical that the Commission [could] provide a reasoned explanation for its ‘fleeting expletive’ regime that would pass constitutional muster,” but it declined to reach the constitutional question. Id., at 462. Judge Leval dissented, id., at 467. We granted certiorari, 552 U. S. 1255 (2008).
III. Analysis
A. Governing Principles
The Administrative Procedure Act, 5 U. S. C. §551 et seq., which sets forth the full extent of judicial authority to review executive agency action for procedural correctness, see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U. S. 519, 545-549 (1978), permits (insofar as relevant here) the setting aside of agency action that is “arbitrary” or “capricious,” 5 U. S. C. § 706(2)(A). Under what we have called this “narrow” standard of review, we insist that an agency “examine the relevant data and articulate a satisfactory explanation for its action.” Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U. S. 29, 43 (1983). We have made clear, however, that “a court is not to substitute its judgment for that of the agency,” ibid., and should “uphold a decision of less than ideal clarity if the agency’s path may reasonably *514 be discerned,” Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U. S. 281, 286 (1974).
In overturning the Commission’s judgment, the Court of Appeals here relied in part on Circuit precedent requiring a more substantial explanation for agency action that changes prior policy. The Second Circuit has interpreted the Administrative Procedure Act and our opinion in State Farm as requiring agencies to make clear “ ‘why the original reasons for adopting the [displaced] rule or policy are no longer dis-positive’ ” as well as “ ‘why the new rule effectuates the statute as well as or better than the old rule.’” 489 F. 3d, at 456-457 (quoting New York Council, Assn. of Civilian Technicians v. FLRA, 757 F. 2d 502, 508 (CA2 1985); emphasis deleted). The Court of Appeals for the District of Columbia Circuit has similarly indicated that a court’s standard of review is “heightened somewhat” when an agency reverses course. NAACP v. FCC, 682 F. 2d 993, 998 (1982).
We find no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review. The Act mentions no such heightened standard. And our opinion in State Farm neither held nor implied that every agency action representing a policy change must be justified by reasons more substantial than those required to adopt a policy in the first instance. That case, which involved the rescission of a prior regulation, said only that such action requires “a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.” 463 U. S., at 42 (emphasis added).[2] Treating failures to act and *515 rescissions of prior action differently for purposes of the standard of review makes good sense, and has basis in the text of the statute, which likewise treats the two separately. It instructs a reviewing court to “compel agency action unlawfully withheld or unreasonably delayed,” 5 U. S. C. § 706(1), and to “hold unlawful and set aside agency action, findings, and conclusions found to be [among other things]... arbitrary [or] capricious,” § 706(2)(A). The statute makes no distinction, however, between initial agency action and subsequent agency action undoing or revising that action.
To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy sub silentio or simply disregard rules that are still on the books. See United States v. Nixon, 418 U. S. 683, 696 (1974). And of course the agency must show that there are good reasons for the new policy. But it need not demonstrate to a court’s satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates. This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate. Sometimes it must — when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account. Smiley v. Citibank (South Dakota), N. A., 517 U. S. 735, 742 (1996). It would be arbitrary or capricious to ignore such matters. In such cases it is not *516 that farther justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.
In this appeal from the Second Circuit’s setting aside of Commission action for failure to comply with a procedural requirement of the Administrative Procedure Act, the broadcasters’ arguments have repeatedly referred to the First Amendment. If they mean to invite us to apply a more stringent arbitrary-and-eapricious review to agency actions that implicate constitutional liberties, we reject the invitation. The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts. See Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council, 485 U. S. 568, 575 (1988). We know of no precedent for applying it to limit the scope of authorized executive action. In the same section authorizing courts to set aside “arbitrary [or] capricious” agency action, the Administrative Procedure Act separately provides for setting aside agency action that is “unlawful,” 5 U. S. C. § 706(2)(A), which of course includes unconstitutional action. We think that is the only context in which constitutionality bears upon judicial review of authorized agency action. If the Commission’s action here was not arbitrary or capricious in the ordinary sense, it satisfies the Administrative Procedure Act’s “arbitrary [or] capricious” standard; its lawfulness under the Constitution is a separate question to be addressed in a constitutional challenge.[3]
*517 B. Application to This Case
Judged under the above described standards, the Commission’s new enforcement policy and its order finding the broadcasts actionably indecent were neither arbitrary nor capricious. First, the Commission forthrightly acknowledged that its recent actions have broken new ground, taking account of inconsistent “prior Commission and staff action” and explicitly disavowing them as “no longer good law.” Golden Globes Order, 19 FCC Red., at 4980, ¶ 12. To be sure, the (superfluous) explanation in its Remand Order of why the Cher broadcast would even have violated its earlier policy may not be entirely convincing. But that unnecessary detour is irrelevant. There is no doubt that the Commission knew it was making a change. That is why it declined to assess penalties; and it relied on the Golden Globes Order as removing any lingering doubt. Remand Order, 21 FCC Red., at 13308, ¶23, 13325, ¶ 61.
Moreover, the agency’s reasons for expanding the scope of its enforcement activity were entirely rational. It was certainly reasonable to determine that it made no sense to distinguish between literal and nonliteral uses of offensive words, requiring repetitive use to render only the latter indecent. As the Commission said with regard to expletive use of the F-Word, “the word’s power to insult and offend derives from its sexual meaning.” Id., at 13323, ¶ 58. And the Commission’s decision to look at the patent offensiveness of even isolated uses of sexual and excretory words fits with the context-based approach we sanctioned in Pacifica, 438 *518 U. S., at 750. Even isolated utterances can be made in “pander[ing,] . . . vulgar and shocking” manners, Remand Order, 21 FCC Red., at 13305, ¶ 17, and can constitute harmful '“first blow[s]’” to children, id., at 13309, ¶25. It is surely rational (if not inescapable) to believe that a safe harbor for single words would “likely lead to more widespread use of the offensive language,” Golden Globes Order, supra, at 4979, ¶ 9.
When confronting other requests for per se rules governing its enforcement of the indecency prohibition, the Commission has declined to create safe harbors for particular types of broadcasts. See In re Pacifica Foundation, Inc., 2 FCC Red., at 2699, ¶ 12 (repudiating the view that the Commission’s enforcement power was limited to “deliberate, repetitive use of the seven words actually contained in the George Carlin monologue”); In re Infinity Broadcasting Corp. of Pa., 3 FCC Red., at 932, ¶ 17 (“rejecting] an approach that would hold that if a work has merit, it is per se not indecent”). The Commission could rationally decide it needed to step away from its old regime where nonrepetitive use of an expletive was per se nonactionable because that was “at odds with the Commission’s overall enforcement policy.” Remand Order, supra, at 13308, ¶ 23.
The fact that technological advances have made it easier for broadcasters to bleep out offending words further supports the Commission’s stepped-up enforcement policy. Golden Globes Order, supra, at 4980, ¶ 11. And the agency’s decision not to impose any forfeiture or other sanction precludes any argument that it is arbitrarily punishing parties without notice of the potential consequences of their action.
C. The Court of Appeals’ Reasoning
The Court of Appeals found the Commission’s action arbitrary and capricious on three grounds. First, the court criticized the Commission for failing to explain why it had not previously banned fleeting expletives as “harmful 'first *519 blow[s].’ ” 489 F. 3d, at 458. In the majority’s view, without “evidence that suggests a fleeting expletive is harmful [and]... serious enough to warrant government regulation,” the agency could not regulate more broadly. Id., at 461. As explained above, the fact that an agency had a prior stance does not alone prevent it from changing its view or create a higher hurdle for doing so. And it is not the Commission, but Congress that has proscribed “any . . . indecent . .. language.” 18 U. S. C. § 1464.
There are some propositions for which scant empirical evidence can be marshaled, and the harmful effect of broadcast profanity on children is one of them. One cannot demand a multiyear controlled study, in which some children are intentionally exposed to indecent broadcasts (and insulated from all other indecency), and others are shielded from all indecency. It is one thing to set aside agency action under the Administrative Procedure Act because of failure to adduce empirical data that can readily be obtained. See, e. g., State Farm, 463 U. S., at 46-56 (addressing the costs and benefits of mandatory passive restraints for automobiles). It is something else to insist upon obtaining the unobtainable. Here it suffices to know that children mimic the behavior they observe — or at least the behavior that is presented to them as normal and appropriate. Programming replete with one-word indecent expletives will tend to produce children who use (at least) one-word indecent expletives. Congress has made the determination that indecent material is harmful to children, and has left enforcement of the ban to the Commission. If enforcement had to be supported by empirical data, the ban would effectively be a nullity.
The Commission had adduced no quantifiable measure of the harm caused by the language in Pacifica, and we nonetheless held that the “government’s interest in the ‘well-being of its youth’ . . . justified the regulation of otherwise protected expression.” 438 U. S., at 749 (quoting Ginsberg v. New York, 390 U. S. 629, 640, 639 (1968)). If the Constitu *520 tion itself demands of agencies no more scientifically certain criteria to comply with the First Amendment, neither does the Administrative Procedure Act to comply with the requirement of reasoned decisionmaking.
The court’s second objection is that fidelity to the agency’s “first blow” theory of harm would require a categorical ban on all broadcasts of expletives; the Commission’s failure to go to this extreme thus undermined the coherence of its rationale. 489 F. 3d, at 458-459. This objection, however, is not responsive to the Commission’s actual policy under review — the decision to include patently offensive fleeting expletives within the definition of indecency. The Commission’s prior enforcement practice, unchallenged here, already drew distinctions between the offensiveness of particular words based upon the context in which they appeared. Any complaint about the Commission’s failure to ban only some fleeting expletives is better directed at the agency’s context-based system generally rather than its inclusion of isolated expletives.
More fundamentally, however, the agency’s decision to consider the patent offensiveness of isolated expletives on a case-by-case basis is not arbitrary or capricious. “Even a prime-time recitation of Geoffrey Chaucer’s Miller’s Tale,” we have explained, “would not be likely to command the attention of many children who are both old enough to understand and young enough to be adversely affected.” Pacifica, supra, at 750, n. 29. The same rationale could support the Commission’s finding that a broadcast of the film Saving Private Ryan was not indecent — a finding to which the broadcasters point as supposed evidence of the Commission’s inconsistency. The frightening suspense and the graphic violence in the movie could well dissuade the most vulnerable from watching and would put parents on notice of potentially objectionable material. See In re Complaints Against Various Television Licensees Regarding Their Broadcast on Nov. 11, 2001 of ABC Television Network's *521 Presentation of Film “Saving Private Ryan,” 20 FCC Red. 4507, 4513, ¶ 15 (2005) (noting that the broadcast was not “intended as family entertainment”). The agency’s decision to retain some discretion does not render arbitrary or capricious its regulation of the deliberate and shocking uses of offensive language at the award shows under review — shows that were expected to (and did) draw the attention of millions of children.
Finally, the Court of Appeals found unconvincing the agency’s prediction (without any evidence) that a per se exemption for fleeting expletives would lead to increased use of expletives one at a time. 489 F. 3d, at 460. But even in the absence of evidence, the agency’s predictive judgment (which merits deference) makes entire sense. To predict that complete immunity for fleeting expletives, ardently desired by broadcasters, will lead to a substantial increase in fleeting expletives seems to us an exercise in logic rather than clairvoyance. The Court of Appeals was perhaps correct that the Commission’s prior policy had not yet caused broadcasters to “barrag[e] the airwaves with expletives,” ibid. That may have been because its prior permissive policy had been confirmed (save in dicta) only at the staff level. In any event, as the Golden Globes order demonstrated, it did produce more expletives than the Commission (which has the first call in this matter) deemed in conformity with the statute.
D. Respondents’ Arguments
Respondents press some arguments that the court did not adopt. They claim that the Commission failed to acknowledge its change in enforcement policy. That contention is not tenable in light of the Golden Globes Order’s specific declaration that its prior rulings were no longer good law, 19 FCC Red., at 4980, ¶ 12, and the Remand Order’s disavowal of those staff rulings and Commission dicta as “seriously flawed,” 21 FCC Red., at 13308, ¶ 23. The broadcasters also try to recharacterize the nature of the Commission’s shift, *522 contending that the old policy was not actually a per se rule against liability for isolated expletives and that the new policy is a presumption of indecency for certain words. This description of the prior agency policy conflicts with the broadcasters’ own prior position in this case. See, e.g., Brief in Opposition for Respondent Fox Television Stations, Inc., et al. 4 (“For almost 30 years following Pacifica, the FCC did not consider fleeting, isolated or inadvertent expletives to be indecent”). And we find no basis for the contention that the Commission has now adopted a presumption of indecency; its repeated reliance on context refutes this claim.
The broadcasters also make much of the fact that the Commission has gone beyond the scope of authority approved in Pacifica, which it once regarded as the farthest extent of its power. But we have never held that Pacifica represented the outer limits of permissible regulation, so that fleeting expletives may not be forbidden. To the contrary, we explicitly left for another day whether “an occasional expletive” in “a telecast of an Elizabethan comedy” could be prohibited. 438 U. S., at 748-750. By using the narrowness of Pacifica!s holding to require empirical evidence of harm before the Commission regulates more broadly, the broadcasters attempt to turn the sword of Pacifica, which allowed some regulation of broadcast indecency, into an administrative-law shield preventing any regulation beyond what Pacifica sanctioned. Nothing prohibits federal agencies from moving in an incremental manner. Cf. National Cable & Telecommunications Assn. v. Brand X Internet Services, 545 U. S. 967, 1002 (2005).
Finally, the broadcasters claim that the Commission’s repeated appeal to “context” is simply a smokescreen for a standardless regime of unbridled discretion. But we have previously approved Commission regulation based “on a nuisance rationale under which context is all-important,” Pacifica, supra, at 750, and we find no basis in the Administrative Procedure Act for mandating anything different.
*523 E. The Dissents’ Arguments
Justice Breyer purports to “begin with applicable law,” post, at 547, but in fact begins by stacking the deck. He claims that the FCC’s status as an “independent” agency sheltered from political oversight requires courts to be “all the more” vigilant in ensuring “that major policy decisions be based upon articulable reasons.” Ibid. Not so. The independent agencies are sheltered not from politics but from the President, and it has often been observed that their freedom from Presidential oversight (and protection) has simply been replaced by increased subservience to congressional direction. See, e. g., In re Sealed Case, 838 F. 2d 476, 507-508 (CADC) (Silbermian, J.), rev’d sub nom. Morrison v. Olson, 487 U. S. 654 (1988); Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2271, n. 93 (2001); Calabresi & Prakash, The President’s Power to Execute the Laws, 104 Yale L. J. 541, 583 (1994); Easterbrook, The State of Madison’s Vision of the State: A Public Choice Perspective, 107 Harv. L. Rev. 1328, 1341 (1994). Indeed, the precise policy change at issue here was spurred by significant political pressure from Congress.[4]
*524 Justice Stevens apparently recognizes this political control by Congress, and indeed sees it as the manifestation of a principal-agency relationship. In his judgment, the FCC is “better viewed as an agent of Congress” than as part of the Executive. Post, at 540 (dissenting opinion). He nonetheless argues that this is a good reason for requiring the FCC to explain “why its prior policy is no longer sound before allowing it to change course.” Post, at 541. Leaving aside the unconstitutionally of a scheme giving the power to enforce laws to agents of Congress, see Bowsher v. Synar, 478 U. S. 714, 726 (1986), it seems to us that Justice Stevens’ conclusion does not follow from his premise. If the FCC is indeed an agent of Congress, it would seem an adequate explanation of its change of position that Congress *525 made clear its wishes for stricter enforcement, see n. 4, supra.[5] The Administrative Procedure Act, after all, does not apply to Congress and its agencies.[6]
Regardless, it is assuredly not “applicable law” that rule-making by independent regulatory agencies is subject to heightened scrutiny. The Administrative Procedure Act, which provides judicial review, makes no distinction between independent and other agencies, neither in its definition of agency, 5 U. S. C. § 701(b)(1), nor in the standards for reviewing agency action, § 706. Nor does any case of ours express or reflect the “heightened scrutiny” Justice Breyer and Justice Stevens would impose. Indeed, it is hard to imagine any closer scrutiny than that we have given to the Environmental Protection Agency, which is not an independent agency. See Massachusetts v. EPA, 549 U. S. 497, 533-535 (2007); Whitman v. American Trucking Assns., Inc., 531 U. S. 457, 481-486 (2001). There is no reason to magnify the separation-of-powers dilemma posed by the headless Fourth *526 Branch, see Freytag v. Commissioner, 501 U. S. 868, 921 (1991) (Scalia, J., concurring in part and concurring in judgment), by letting Article III judges — like jackals stealing the lion’s kill — expropriate some of the power that Congress has wrested from the unitary Executive.
Justice Breyer and Justice Stevens rely upon two supposed omissions in the FCC’s analysis that they believe preclude a finding that the agency did not act arbitrarily. Neither of these omissions could undermine the coherence of the rationale the agency gave, but the dissenters’ evaluation of each is flawed in its own right.
First, both claim that the Commission failed adequately to explain its consideration of the constitutional issues inherent in its regulation, post, at 553-556 (opinion of Breyer, J.); post, at 542-546 (opinion of Stevens, J.). We are unaware that we have ever before reversed an executive agency, not for violating our cases, but for failure to discuss them adequately. But leave that aside. According to Justice Breyer, the agency said “next to nothing about the relation between the change it made in its prior ‘fleeting expletive’ policy and the First-Amendment-related need to avoid ‘censorship,’ ” post, at 553. The Remand Order does, however, devote four full pages of small-type, single-spaced text (over 1,300 words not counting the footnotes) to explaining why the Commission believes that its indecency-enforcement regime (which includes its change in policy) is consistent with the First Amendment — and therefore not censorship as the term is understood. More specifically, Justice Breyer faults the FCC for “not explaining] why the agency changed its mind about the line that Pacifica draws or its policy’s relation to that line,” post, at 556. But in fact (and as the Commission explained) this Court’s holding in Pacifica, 438 U. S. 726, drew no constitutional line; to the contrary, it expressly declined to express any view on the constitutionality of prohibiting isolated indecency. Justice Breyer and Justice Stevens evidently believe that when an agency has *527 obtained this Court’s determination that a less restrictive rule is constitutional, its successors acquire some special burden to explain why a more restrictive rule is not '^constitutional. We know of no such principle.[7]
Second, Justice Breyer looks over the vast field of particular factual scenarios unaddressed by the FCC’s 35-page Remand Order and finds one that is fatal: the plight of the small local broadcaster who cannot afford the new technology that enables the screening of live broadcasts for indecent utterances. Cf. post, at 556-561. The Commission has failed to address the fate of this unfortunate, who will, he believes, be subject to sanction.
We doubt, to begin with, that small-town broadcasters run a heightened risk of liability for indecent utterances. In programming that they originate, their down-home local guests probably employ vulgarity less than big-city folks; and small-town stations generally cannot afford or cannot attract foul-mouthed glitteratae from Hollywood. Their main exposure with regard to self-originated programming is live coverage of news and public affairs. But the Remand Order went out of its way to note that the ease at hand did not involve “breaking news coverage,” and that “it may be inequitable to hold a licensee responsible for airing offensive *528 speech during live coverage of a public event,” 21 FCC Red., at 13311, ¶ 33. As for the programming that small stations receive on a network “feed”: This will be cleansed by the expensive technology small stations (by Justice Breyer’s hypothesis) cannot afford.
But never mind the detail of whether small broadcasters are uniquely subject to a great risk of punishment for fleeting expletives. The fundamental fallacy of Justice Breyer’s small-broadcaster gloomy scenario is its demonstrably false assumption that the Remand Order makes no provision for the avoidance of unfairness — that the single-utterance prohibition will be invoked uniformly, in all situations. The Remand Order made very clear that this is not the case. It said that in determining “what, if any, remedy is appropriate” the Commission would consider the facts of each individual case, such as the “possibility of human error in using delay equipment,” id., at 13313, ¶ 35. Thus, the fact that the agency believed that Fox (a large broadcaster that used suggestive scripting and a deficient delay system to air a prime-time awards show aimed at millions of children) “fail[ed] to exercise ‘reasonable judgment, responsibility and sensitivity,”’ id., at 13311, ¶33, and n. 91 (quoting Pacifica Foundation, Inc., 2 FCC Red., at 2700, ¶ 18), says little about how the Commission would treat smaller broadcasters who cannot afford screening equipment. Indeed, that they would not be punished for failing to purchase equipment they cannot afford is positively suggested by the Remand Order’s statement that “[hjolding Fox responsible for airing indecent material in this case does not. .. impose undue burdens on broadcasters.” 21 FCC Red., at 13313, ¶ 36.
There was, in sum, no need for the Commission to compose a special treatise on local broadcasters.[8] And Justice *529 Breyer can safely defer his concern for those yeomen of the airwaves until we have before us a case that involves one.
IV. Constitutionality
The Second Circuit did not definitively rule on the constitutionality of the Commission’s orders, but respondents nonetheless ask us to decide their validity under the First Amendment. This Court, however, is one of final review, “not of first view.” Cutter v. Wilkinson, 544 U. S. 709, 718, n. 7 (2005). It is conceivable that the Commission’s orders may cause some broadcasters to avoid certain language that is beyond the Commission’s reach under the Constitution. Whether that is so, and, if so, whether it is unconstitutional, will be determined soon enough, perhaps in this very case. Meanwhile, any chilled references to excretory and sexual material “surely lie at the periphery of First Amendment concern,” Pacifica, 438 U. S., at 743 (plurality opinion of Stevens, J.). We see no reason to abandon our usual procedures in a rush to judgment without a lower court opinion. We decline to address the constitutional questions at this time.
The Second Circuit believed that children today “likely hear this language far more often from other sources than they did in the 1970s when the Commission first began sanctioning indecent speech,” and that this cuts against more stringent regulation of broadcasts. 489 F. 3d, at 461. Assuming the premise is true (for this point the Second Circuit did not demand empirical evidence) the conclusion does not necessarily follow. The Commission could reasonably conclude that the pervasiveness of foul language, and the coars *530 ening of public entertainment in other media such as cable, justify more stringent regulation of broadcast programs so as to give conscientious parents a relatively safe haven for their children. In the end, the Second Circuit and the broadcasters quibble with the Commission’s policy choices and not with the explanation it has given. We decline to “substitute [our] judgment for that of the agency,” State Farm, 468 U. S., at 43, and we find the Commission’s orders neither arbitrary nor capricious.
The judgment of the United States Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

 The statutory prohibition applicable to commercial radio and television stations extends by its terms from 6 a.m. to 12 midnight. The Court of Appeals for the District of Columbia Circuit held, however, that because “Congress and the Commission [had] backed away from the consequences of their own reasoning,” by allowing some public broadcasters to air indecent speech after 10 p.m., the court was forced “to hold that the section is unconstitutional insofar as it bars the broadcasting of indecent speech between the hours of 10:00 p.m. and midnight.” Action for Children’s Television v. FCC, 58 F. 3d 654, 669 (1995) (en banc), cert. denied, 516 U. S. 1043 (1996).

 Justice Breyer’s contention that State Farm did anything more, post, at 549-552 (dissenting opinion), rests upon his failure to observe the italicized phrase and upon a passage quoted in State Farm from a plurality opinion in Atchison, T. & S. F. R. Co. v. Wichita Bd. of Trade, 412 U. S. 800 (1973). That passage referred to “a presumption that [congressional] policies will be carried out best if the settled rule is adhered to.” Id., at 807-808 (opinion of Marshall, J.). But the Atchison plurality made this statement in the context of requiring the agency to provide some explanation for a change, “so that the reviewing court may understand the basis *515 of the agency’s action and so may judge the consistency of that action with the agency’s mandate,” id., at 808. The opinion did not assert the authority of a court to demand explanation sufficient to enable it to weigh (by its own lights) the merits of the agency’s change. Nor did our opinion in State Farm.

 Justice Bkeyer claims that “[t]he Court has often applied [the doctrine of constitutional avoidance] where an agency’s regulation relies on a plausible but constitutionally suspect interpretation of a statute.” Post, at 566. The cases he cites, however, set aside an agency regulation because, applying the doctrine of constitutional avoidance to the ambiguous statute under which the agency acted, the Court found the agency’s interpretation of the statute erroneous. See Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers, 531 U. S. 159, 174 (2001); NLRB v. Catholic Bishop of Chicago, 440 U. S. 490, 507 (1979). But Justice *517 Breyer does not urge that we issue such a holding, evidently agreeing that we should limit our review to what the Court of Appeals decided, see Part IV, infra — which included only the adequacy of the Commission’s rulemaking procedure, and not the statutory question. Rather, Justice Breyer seeks a “remand [that] would do no more than ask the agency to reconsider its policy decision in light of” constitutional concerns. Post, at 566. That strange and novel disposition would be entirely unrelated to the doctrine of constitutional avoidance, and would better be termed the doctrine of judicial arm-twisting or appellate review by the wagged finger.

 A Subcommittee of the FCC’s House Oversight Committee held hearings on the FCC’s broadcast indecency enforcement on January 28, 2004. “Can You Say That on TV?”: An Examination of the FCC’s Enforcement with Respect to Broadcast Indecency, Hearing before the Subcommittee on Telecommunications and the Internet of the House Committee on Energy and Commerce, 108th Cong., 2d Sess. Members of the Subcommittee specifically “called on the full Commission to reverse [the staff ruling in the Golden Globes case]” because they perceived a “feeling amongst many Americans that some TV broadcasters are engaged in a race to the bottom, pushing the decency envelope in order to distinguish themselves in the increasingly crowded entertainment field.” Id., at 2 (statement of Rep. Upton); see also, e. g., id., at 17 (statement of Rep. Terry), 19 (statement of Rep. Pitts). They repeatedly expressed disapproval of the FCC’s enforcement policies, see, e. g., id., at 3 (statement of Rep. Upton) (“At some point, we have to ask the FCC: How much is enough? When will it revoke a license?”); id., at 4 (statement of Rep. Markey) (“Today’s hearing *524 will allow us to explore the FCC’s lackluster enforcement record with respect to these violations”).
About two weeks later, on February 11, 2004, the same Subcommittee held hearings on a bill increasing the fines for indecency violations. Hearings on H. R. 3717 before the Subcommittee on Telecommunications and the Internet of the House Committee on Energy and Commerce, 108th Cong., 2d Sess. All five Commissioners were present and were grilled about enforcement shortcomings. See, e. g., id., at 124 (statement of Rep. Terry) (“Chairman Powell, ... it seems like common sense that if we had . . . more frequent enforcement instead of only a few examples of fines ... that would be a deterrent in itself”); id., at 7 (statement of Rep. Dingell) (“I see that apparently ... there is no enforcement of regulations at the FCC”). Certain statements, moreover, indicate that the political pressure applied by Congress had its desired effect. See ibid. (“I think our committee’s work has gotten the attention of FCC Chairman Powell and the Bush Administration. And I’m happy to see the FCC now being brought to a state of apparent alert on these matters”); see also id., at 124 (statement of Michael Copps, FCC Commissioner) (noting “positive” change in other Commissioners’ 'willingness to step up enforcement in light of proposed congressional action). A version of the bill ultimately became law as the Broadcast Decency Enforcement Act of 2005, 120 Stat. 491.
The FCC adopted the change that is the subject of this litigation on March 3,2004, about three weeks after this second hearing. See Golden Globes Order, 19 FCC Rcd. 4975.

 Justice Stevens accuses us of equating statements made in a congressional hearing with the intent of Congress. Post, at 541-542, n. 3. In this opinion, we do not. The intent of the full Congress (or at least a majority of each House) is thought relevant to the interpretation of statutes, since they must be passed by the entire Congress. See U. S. Const., Art. I, § 7. It is quite irrelevant, however, to the extrastatutory influence Congress exerts over agencies of the Executive Branch, which is exerted by the congressional committees responsible for oversight and appropriations with respect to the relevant agency. That is a major reason why committee assignments are important, and committee chairmanships powerful. Surely Justice Stevens knows this.

 The Administrative Procedure Act defines “agency” to mean “each authority of the Government of the United States,” 5 U. S. C. § 551(1), but specifically excludes “the Congress,” § 551(1)(A). The Court of Appeals for the District of Columbia Circuit has “interpreted [this] exemption for ‘the Congress’ to mean the entire legislative branch,” Washington Legal Foundation v. United States Sentencing Comm’n, 17 F. 3d 1446, 1449 (1994); see also Ethnic Employees of Library of Congress v. Boorstin, 751 F. 2d 1405, 1416, n. 15 (CADC 1985) (holding that the Library of Congress is not an “agency” under the Act).

 Justice Stevens criticizes us for “assuming that Pacifica endorsed” the enforcement at issue here. Post, at 542. We do nothing of the sort. We rely on the fact that certain aspects of the agency’s decision mirror the context-based approach Pacifica approved, supra, at 517-518, but that goes to our holding on administrative law, and says nothing about constitutionality. Justice Stevens also argues that heightened deference should be due the FCC’s prior policy because the “FCC’s initial views ... reflect the views of the Congress that delegated the Commission authority to flesh out details not fully defined in the enacting statute.” Post, at 541. We do not believe that the dead hand of a departed congressional oversight Committee should constrain the discretion that the text of a statute confers — but the point is in any event irrelevant in this appeal, which concerns not whether the agency has exceeded its statutory mandate but whether the reasons for its actions are adequate.

 Justice Breyer posits that the FCC would have been required to give more explanation had it used notice-and-comment rulemaking, which “should lead us to the same conclusion” in this review of the agency’s change through adjudication. Post, at 562. Even assuming the premise, *529 there is no basis for incorporating all of the Administrative Procedure Act’s notice-and-comment procedural requirements into arbitrary-andeapricious review of adjudicatory decisions. Cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U. S. 519, 545-549 (1978).