# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 3, 2014        Decided December 12, 2014

No. 14-5076

ASSOCIATED BUILDERS AND CONTRACTORS, INC.,
APPELLANT

v.

PATRICIA A. SHIU, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01806)

---

*Maurice Baskin* argued the cause and filed the briefs for appellant.

*Stephanie R. Marcus*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen*, *Jr.*, U.S. Attorney, and *Marleigh D. Dover*, Attorney.

*Daniel F. Goldstein* was on the brief for *amici curiae* American Association of People with Disabilities, et al. in support of appellees.

Before: GARLAND, *Chief Judge*, TATEL, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Section 503 of the Rehabilitation Act of 1973 requires that certain government contractors "take affirmative action to employ and advance in employment qualified individuals with disabilities." Until recently, the Department of Labor's implementing regulations required government contractors to "invite" individuals *offered* jobs to advise the contractor whether they believed they were covered by the Act. Doubting that the existing regulations were sufficiently advancing the employment of qualified individuals with disabilities, the Department revised the regulations to require contractors to extend this invitation to job *applicants*, as well as to analyze the resulting data. The revised regulations also adopt a "utilization goal" to serve as a target for the employment of individuals with disabilities. In this case, a trade group representing federal contractors challenges these regulations, arguing that they exceed the Department's statutory authority and are arbitrary and capricious. The district court rejected both challenges, as do we.

## I.

Congress enacted the Rehabilitation Act of 1973, 29 U.S.C § 701, et seq., "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society," as well as "to ensure that the Federal Government plays a leadership role in promoting the employment of individuals with disabilities." 29 U.S.C. § 701(b). Section 503 of the Act provides that government contracts for more than $10,000

"shall contain a provision requiring that the party contracting with the United States shall take affirmative action to employ and advance in employment qualified individuals with disabilities." 29 U.S.C. § 793(a). The statute directs the President to implement section 503 through regulations, *id.*, and the President has delegated that authority to the Secretary of Labor, who has in turn delegated it to the Office of Federal Contract Compliance Programs (OFCCP). 41 C.F.R. § 60–1.2.

The regulations in effect prior to the challenged rulemaking required contractors to "prepare and maintain an affirmative action program." 41 C.F.R. § 60–741.40. Specifically, the regulations required them to ensure that job standards do not improperly exclude individuals with disabilities, to publicize their affirmative-action plan, to engage in steps to recruit qualified individuals with disabilities, and to audit the effectiveness of the program. *See* Superseded OFCCP Rule on Affirmative Action for Qualified Individuals with Disabilities, 41 C.F.R. §§ 60–741.40 to –.47 (Effective Prior to Mar. 24, 2014). The regulations also required contractors to "invite" individuals *offered* jobs to inform the contractor if they believed they were covered by the Act. *Id.*

By 2010, OFCCP had become concerned that the section 503 regulations were not sufficiently advancing the employment of qualified individuals with disabilities. *See* Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors; Evaluation of Affirmative Action Provisions Under Section 503 of the Rehabilitation Act, as Amended, 75 Fed. Reg. 43,116 (July 23, 2010). OFCCP was especially worried that individuals with disabilities had lower workforce participation rates and higher unemployment rates than those without disabilities. *Id.* After

seeking public comment on how to strengthen the regulations, *id.*, OFCCP issued a Notice of Proposed Rulemaking in December of 2011. *See* Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals With Disabilities, Notice of Proposed Rulemaking, 76 Fed. Reg. 77,056 (Dec. 9, 2011). In response to hundreds of comments on a variety of issues, OFCCP made some modifications and issued the Final Rule on September 24, 2013. *See* Affirmative Action and Nondiscrimination Obligations of Contractors and Subcontractors Regarding Individuals With Disabilities, Final Rule, 78 Fed. Reg. 58,682, 58,685 (Sept. 24, 2013) (to be codified at 41 C.F.R. pt. 60–741) ("Final Rule").

The Final Rule makes several significant changes, two of which are challenged here. First, it obligates contractors to extend the invitation to self-identify to all job *applicants* and to analyze the resulting data. This new requirement is implemented by section 741.42(a) of the Final Rule, which requires contractors to invite job applicants to indicate whether they have a disability, 41 C.F.R. § 60–741.42(a), and by section 741.44(k), which requires analysis of the data collected, along with the number of job openings, the total number of applicants, the number of applicants hired, and the number of applicants hired who have disabilities, *id.* § 60–741.44(k).

Second, section 741.45 of the Final Rule introduces a 7 percent "utilization goal" for the employment of individuals with disabilities. For employers with 100 or fewer employees, the goal applies to the employer's entire workforce, while for employers with more than 100 employees, the goal applies to each job group within the workforce. The goal establishes "a benchmark against which the contractor must measure the representation of individuals" with disabilities. *Id.* § 60–

741.45. "The goal is not a rigid and inflexible quota which must be met" but rather "is intended solely as a tool." Final Rule at 58,706.

To calculate the utilization goal, OFCCP used data from the American Community Survey (ACS), a detailed view of U.S. households produced by the Census Bureau. *See* Final Rule at 58,703. OFCCP began by estimating that "5.7% of the civilian labor force has a disability." *Id.* at 58,704. (A member of the civilian labor force is either presently working or unemployed and looking for work.) *Id.* According to OFCCP, this percentage would be higher absent discrimination on the basis of disability. *Id.* at 58,704–06. OFCCP therefore compared the percent of the *civilian labor force* with a disability to the percent of the *general population* with a disability who identify as having an occupation, from which it derived what it called a "discouraged worker" effect of 1.7 percent. *Id.* Adding that figure to 5.7 percent, OFCCP arrived at 7.4 percent, which it rounded down to 7 percent in order to "avoid implying a false level of precision." *Id.* at 58,705.

Taken together, these two requirements, OFCCP explained, are "an important means by which the Government can contribute to reducing the employment disparity between those with and without disabilities." *Id.* at 58,684. The new provisions "are designed to bring more qualified individuals with disabilities into the Federal contractor workforce and provide them with an equal opportunity to advance in employment." *Id.* at 58,685.

Appellant, Associated Builders and Contractors, Inc. (ABC), a "national trade association representing" members from "construction and industry-related firms," has many members that are government contractors and therefore subject to section 503. Appellant's Br. 15. ABC sued in the

United States District Court for the District of Columbia, challenging the Final Rule as both beyond OFCCP's statutory authority and arbitrary and capricious. *Id.* at 16. Rejecting both arguments, the district court granted summary judgment to OFCCP. *Associated Builders & Contractors, Inc. v. Shiu*, No. 13–1806, 2014 WL 1100779 (D.D.C. Mar. 21, 2014). We review the district court's grant of summary judgment *de novo*, "according no particular deference to the judgment of the District Court." *Association of Private Sector Colleges and Universities v. Duncan*, 681 F.3d 427, 440–41 (D.C. Cir. 2012) (citation and internal quotation mark omitted).

## II.

Because the Rehabilitation Act vests the executive branch with rulemaking authority, we proceed under the familiar two-step framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837 (1984). In accordance with that decision, we determine first "whether Congress has directly spoken to the precise question at issue," and "if the statute is silent or ambiguous with respect to the specific issue," we ask whether the agency's interpretation "is based on a permissible construction of the statute." *Id.* at 842–43.

For ABC "to prevail under *Chevron* step one, [it] must do more than offer a reasonable or, even the best, interpretation; it must show that the statute *unambiguously* forecloses" OFCCP's interpretation. *Village of Barrington, Illinois v. Surface Transportation Board*, 636 F.3d 650, 661 (D.C. Cir. 2011). ABC argues that the word "qualified" as used in section 503—"take affirmative action to employ and advance in employment qualified individuals with disabilities"—expressly limits affirmative action to individuals already offered jobs. But that word does no such

thing. It does not modify "affirmative action," nor does anything in section 503 limit "affirmative action" to those offered jobs. Rather, the word "qualified" describes the statute's beneficiaries—"qualified individuals with disabilities." In fact, the provisions of the final rule ABC challenges are all expressly designed to promote the "employ[ment] and advance[ment] in employment [of] *qualified* individuals." 29 U.S.C. § 793 (emphasis added).

Undaunted by the statute's plain language, ABC invokes other evidence to make its case. Observing that "Congress repeatedly amended the Act without expressing any disapproval of OFCCP's implementation of" the statute, it argues that "[b]oth the Supreme Court and this Court have repeatedly held that Congressional re-enactment of a statute without pertinent change to an agency's longstanding interpretation of it is persuasive evidence that the interpretation is the one intended by Congress." Appellant's Br. 28 (citation and internal quotation marks omitted). Although this is certainly true in principle, in this case OFCCP never issued a limiting "interpretation" that Congress could have endorsed via silence. Although the previous regulations included neither a pre-job-offer data-collection requirement nor a utilization goal, OFCCP never said it lacked authority to include such requirements or that it would not do so in the future. In other words, although OFFCP did not make use of its full panoply of powers with the earlier regulations, "powers . . . are not lost by being allowed to lie dormant." *Altman v. SEC*, 666 F.3d 1322, 1327 (D.C. Cir. 2011) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 647 (1950)). Indeed, were ABC correct, agencies would be unable to strengthen regulations implementing statutes that Congress has amended. This is simply not how administrative law works.

ABC grounds its next argument in the Vietnam Era Veterans Readjustment Assistance Act (VEVRAA), also administered by OFCCP, which expressly requires contractors to report data on the veteran status of new hires. According to ABC, this "expression of Congressional intent to delegate authority to an agency to engage in an activity . . . in very similar legislation to the statute at issue, combined with the Congressional failure to include such authorization in the challenged statute itself, [is] compelling evidence as to Congressional intent." Appellant's Br. 30. But that situation differs from the one we face here. Nothing in VEVRAA's original language called for data reporting, but OFCCP required it nonetheless. Only after OFCCP discontinued the requirement did Congress amend VEVRAA with language "motivated by Congress's desire to restore OFCCP's prior practice of requiring similar reports by regulation." *Associated Builders & Contractors,* 2014 WL 1100779 at *8. The VEVRAA amendment thus tells us nothing about the issue in this case.

In a footnote, ABC also offers a *Chevron* step two argument, but it is the same as its step one argument. It fails for the same reason.

### III.

Turning to ABC's arbitrary and capricious challenge, we must first consider the association's argument that these regulations are subject to heightened review under *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009). There, the Supreme Court held that when a change in agency policy "rests upon factual findings that contradict those which underlay its prior policy . . . a reasoned explanation is needed for disregarding facts and circumstances that underlay" the prior policy. *Fox*, 556 U.S. at 515–16. According to ABC,

OFCCP has found "that the ACS survey data was somehow sufficient" to set a utilization goal, and this conflicts with its earlier finding that it had insufficient data to set such a goal. Appellant's Br. 37. This is inaccurate. Prior to the challenged rulemaking, OFCCP never found that setting a utilization goal was infeasible; indeed, nothing in the administrative record suggests that it even considered setting such a goal. In other words, no prior factual finding conflicts with the finding underlying the challenged Rule, i.e., that the ACS provides a feasible basis for calculating a utilization goal. Given this, we shall proceed in accordance with the normal arbitrary and capricious standard. *See* 5 U.S.C. § 706(2)(A). "The scope of review . . . is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) (citation and internal quotation marks omitted).

ABC advances several arbitrary and capricious challenges. For purposes of our analysis, we have grouped them into four categories.

ABC first argues that OFCCP has failed to explain the need for the Final Rule. Specifically, "OFCCP does not claim that the lack of improvement [in the employment of individuals with disabilities] exists among *government contractors* . . . but only that a continuing disparity exists in the workforce population as a whole." Appellant's Br. 35. But OFCCP had no obligation to make such a particularized finding. Rather, it was permitted to infer the existence of employment barriers from its analysis of the workforce as a whole without "a finding in each case that the status quo is

discriminatory," *Allen v. Heckler*, 780 F.2d 64, 68 (D.C. Cir. 1985).

Next, ABC challenges the requirement that contractors collect data from all job *applicants* instead of from just those *offered* jobs. According to ABC, although "newly hired employees are presumably qualified for the positions to which they have been hired," the "new data collection on mere job applicants is meaningless, because there is no way to tell whether the applicants measured are qualified or not." Appellant's Br. 33. If this argument sounds familiar, that's because it reprises the statutory argument we have already rejected. As explained above, *supra at* pp. 5–6, the word "qualified" refers to the beneficiaries of affirmative action; it does not limit the kind of affirmative action OFCCP can require. In a related argument, ABC contends that OFCCP failed to explain how the new data collection "will enable anyone to better monitor or evaluate contractors' hiring of qualified individuals with disabilities." Appellant's Br. 33–34. But doing just that, OFCCP explained that "[m]aintaining this information will provide meaningful data to assist the contractor in evaluating and tailoring its recruitment and outreach efforts." Final Rule at 58,701. Absent such data, it is "nearly impossible for the contractor and OFCCP to perform even rudimentary evaluations of the availability of individuals with disabilities in the workforce, or to make any sort of objective, data-based assessments of how effective contractor outreach and recruitment efforts have been in attracting individuals with disabilities as candidates." *Id.* OFCCP has more than satisfied its obligation to provide a reasoned explanation and to draw a connection between the problem (the low workforce participation of individuals with disabilities) and the regulatory solution (more refined data collection).

ABC next challenges the utilization goal, pointing out that the ACS does "not use the same definition of disabilities as the new Rule," does not break down the data by industry or geography, and "could not possibly have surveyed whether the disabled workers in question were 'qualified' for jobs in different industries in any particular percentages." Appellant's Br. 35–36. Of course, OFCCP knew all of this. As to ABC's first point, OFCCP acknowledged that "[t]he definition of disability used by the ACS . . . is clearly not as broad as that of the Rehabilitation Act," Final Rule at 58,703, and, if anything, this difference would result in an *underestimate* of the size of the population with disabilities. OFCCP also explained that its decision to set a single national goal rested on the fact that since "the ACS disability data is based on sampling, and because the percentage of that sample who identify as having a disability is [small], it cannot be broken down into as many job titles, or as many geographic areas as the data for race and gender." *Id.* at 58,704. What's more, based on the geographic data that OFCCP did have, it observed that there was an "almost uniform distribution" of individuals with disabilities and explained that "[t]his general uniformity is consistent with the use of a single national goal." *Id.* at 58,704 n. 24.

With respect to ABC's complaint that the ACS is incapable of measuring the number of qualified individuals with disabilities in particular industries, we are unsure how the survey could do that since job qualifications vary from position to position and industry to industry. ABC believes this means that the use of any survey data is inappropriate, since it could include individuals who are unqualified for particular jobs. Of course, there may be fewer individuals with disabilities who are qualified to perform certain jobs, just as there are fewer individuals without disabilities who are qualified to fill some positions because skills are unevenly

distributed across the labor force. As mentioned above, OFCCP determined that, based upon the ACS data, 5.7 percent of the civilian labor force has a disability. *See supra* p. 5. OFCCP also determined that an additional 1.7 percent of the population has a disability and an occupation, but is not presently seeking employment. *See supra* p. 5. It reasoned that many people who are working, actively looking for work, or identify as having an occupation are qualified to perform at least some jobs that might be offered by a federal contractor. Final Rule at 58,705–06. Although both ABC and OFCCP might prefer a utilization goal that accounts for variations in the number of qualified individuals with a disability by industry or job type, the agency adequately explained why the best available data did not allow it to create a tailored goal and why the uniform goal advances its regulatory objective. *See WorldCom, Inc. v. FCC*, 238 F.3d 449, 461–62 (D.C. Cir. 2001) ("[T]he [agency] is not required to identify the optimal threshold with pinpoint precision. It is only required to identify the standard and explain its relationship to the underlying regulatory concerns.").

ABC also challenges the way in which OFCCP calculated the utilization goal. Specifically, it objects to the "discouraged worker effect" because, it says, OFCCP "rejected without any evidence the likelihood that a significant number of such workers were unable to work because of the disqualifying nature of their disabilities." Appellant's Br. 38. But OFCCP knew that the underemployment of individuals with disabilities could have different causes and concluded "that at least a portion of this gap is due to discrimination." Final Rule at 58,706. Furthermore, OFCCP recognized that "[w]hile not perfect, the goal will provide a yardstick against which contractors will be able to measure the effectiveness of their equal employment opportunity efforts." *Id.*

Finally, ABC argues that, for several reasons, OFCCP should have exempted the construction industry from the Final Rule. Explaining that the industry is "uniquely hazardous and physical compared to other industries," ABC insists that "[i]n this environment, decisions to hire and/or employ disabled individuals must be made on a case by case basis, without regard to statistics, in order to determine the ability of each individual to perform the essential functions of particular construction jobs." Appellant's Br. 40. ABC believes the construction industry will find it especially difficult to comply with the Final Rule because the fluid and transitory nature of its workforce makes it hard to perform utilization-goal analysis on a job-group basis. Construction contractors, ABC also tells us, have "no experience" with job-group analysis because under Executive Order 11246, which requires affirmative action in the hiring of women and minorities, construction contractors are required to perform utilization-goal analysis only on an employer-wide basis. *Id.* at 39–40.

None of these arguments demonstrates that OFCCP acted arbitrarily and capriciously by failing to exempt the construction industry from the Final Rule. For one thing, the Final Rule does not prohibit employers from making case-by-case hiring decisions based on the qualifications of each individual. As OFCCP emphasized, nothing in the Final Rule "require[s] a contractor to hire an individual who cannot perform the essential functions of [a] job." Final Rule at 58,707. ABC, moreover, never explains how the fluidity of the construction industry workforce makes job-group analysis so burdensome as to require an industry exemption, especially given that the Final Rule exempts small contractors from the job-group requirement. *Id.* at 58,709. And ABC's final argument proves too much, as the "no experience" claim

would doom virtually any regulation that imposes new obligations on regulated entities.

We end as we began by emphasizing that our review of an agency's exercise of its rulemaking authority is narrow. Judicial review exists to ensure that agency actions are the "product of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012). Here, ABC points to nothing in the rulemaking that suggests OFCCP flunked this highly deferential standard.

## IV.

For the foregoing reasons, we affirm.

*So ordered.*