Chief Judge KOZINSKI, with whom Judge NOONAN joins,
dissenting:
The United States stands alone in our commitment to freedom of speech. No other nation — not even freedom-loving countries like Canada, England, Australia, New Zealand and Israel — has protections of free speech and free press like those enshrined in the First Amendment. These aren’t dead words on paper written two centuries ago; they live. In many ways, the First Amendment is America. We would be a very different nation but for the constant buffeting of our public and private institutions by a maelstrom of words and ideas, “uninhibited, robust, and wide-open.” N.Y. Times v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).
*1212 But the First Amendment isn’t self-executing; it depends on the vigilance of judges in scrutinizing the multitude of prohibitions, restrictions, burdens and filters that government — federal, state and local — constantly seeks to impose on speech and the press. The essence of First Amendment vigilance is skepticism, not deference. Governments always have reasons for the things they do and, for the most part, we accept those reasons as valid, even if they’re not entirely persuasive. But prohibitions on speech are different. Whether we engage in strict scrutiny, which applies to most forms of speech, or intermediate scrutiny, which my colleagues believe applies here, we don’t uphold restrictions on speech if the government’s reasons do not, at the very least, make sense.
The majority embraces every justification advanced by the government without the least hesitation or skepticism, and without giving proper weight to the true harms caused by the speech restrictions in question. The opinion is certainly a fine example of rational basis review, but if intermediate scrutiny is to have any bite, we can’t just trot out all of the reasons the government advances in support of the regulation and salute.
The Supreme Court showed us how intermediate scrutiny should be done in FCC v. League of Women Voters, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). There, the Court found restrictions on speech wanting because the government’s justifications were speculative and any problems could be remedied by less drastic means. Id. at 385-99, 104 S.Ct. 3106. The majority here downplays League of Women Voters as an obvious case of governmental overreach, but it wasn’t so obvious to the four Justices who wrote three separate dissents taking the majority to task for failing to accord the speech restrictions sufficient deference. The majority cites the League of Women Voters opinion, but its approach resembles far more the dissents.
That said, it’s hard to pinpoint exactly where the majority goes astray. I will note what I consider to be errors, but doubt I can persuade those not already on board. How could I? With a standard as mushy and toothless as intermediate scrutiny, it’s hard to be clearly wrong. A standard that calls on us to distinguish among shades of gray provides scant protection to speech: The very indeterminacy of the standard enables — nay, encourages — judges to apply their own values. Speech that judges like gets protected, and speech that judges don’t like gets the back of the hand. And judges like public radio and television, while pretty much nobody likes commercials. It’s hardly a fair fight, which is why I believe it’s time to reconsider the applicability of intermediate scrutiny to broadcast restrictions.
The Court plucked broadcast stations out of the mainstream of First Amendment jurisprudence in 1969, when the world of communications looked vastly different. The only way to reach mass audiences in those days was through the broadcast spectrum. And no medium of communication approached the power of radio and television to reach into people’s homes with sounds and images. Given the scarcity of the broadcast spectrum and the absence of viable alternative means of communication, the Court may have justifiably believed that it was confronted with a market failure — a bottleneck in the pathways of communication. It may have served the First Amendment to correct that market failure by keeping those pathways accessible to a multitude of views, Red Lion Broad. Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), safe for minors, FCC v. Pacifica Found., 438 U.S. *1213 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), and otherwise regulated.
I’m certainly not the first one to note that that rationale — whatever its merits at the time — no longer carries any force. See, e.g., FCC v. Fox Television Stations, 556 U.S. 502, 129 S.Ct. 1800, 1819-22, 173 L.Ed.2d 738 (2009) (Thomas, J., concurring). It’s a fine point whether judges of the inferior courts are bound by Supreme Court decisions that the Court itself hasn’t yet bothered to overrule, but whose rationale has been decimated by intervening developments. I was once of the view that only the Supreme Court may perform such operations, and the rest of us must keep applying law we know to be wrong until the Court tells us otherwise. In fact, I once wrote a jeremiad warning my colleagues of the perils of treating a Supreme Court case as overruled, when the Court itself hadn’t told us so. In that case, we not only defied a six decades-old Supreme Court precedent, but also dozens of cases in every other regional circuit. See United States v. Gaudin, 28 F.3d 943 (9th Cir.1994) (en banc) (Kozinski, J., dissenting). And, as I predicted, the Court granted cert, and ... unanimously affirmed us. United States v. Gaudin, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). So I guess the lesson is, we must not get ahead of the Supreme Court — unless we’re right.
I
The statute here draws a curious line between permissible and impermissible speech: Advertisements for commercial goods and services are prohibited, and so are those for political candidates and issues. 47 U.S.C. § 399b. But logograms and advertisements for goods sold by noncommercial entities are permitted. Id. To determine whether speech falls on the permitted or prohibited side of the line, the regulator (here the FCC) must evaluate what the speech says; it must evaluate speech based only on its content. Moreover, as the majority recognizes, some of the prohibited speech — namely political and issue advertising — implicates the First Amendment’s core concern with ensuring an informed electorate. We must therefore be doubly skeptical: first, because the restriction is content-based and, second, because we have traditionally treated some of the prohibited speech with the greatest solicitude.
The majority declares itself satisfied with the evidence supporting these prohibitions and distinctions, but the record is much sparser and far more ambiguous than the majority acknowledges. There is, for starters, almost nothing in the congressional record compiled at the time the legislation was adopted that speaks to the supposed dangers posed by political and issue advertising. Many witnesses testified about their fear that “[commercialization [would] make public television indistinguishable from the new commercial or pay culture cable services.” Maj. op. 1202 (citing Hearings before the Subcomm. on Telecomms., Consumer Protection, and Finance of the H. Comm. on Energy and Commerce on H.R. 3238 and H.R. 277Jp, 97th Cong. 149 (1981) (Larry Sapadin, Executive Director, Association of Independent Video & Filmmakers, Inc.) [hereinafter H. Hgs.]); see also H. Hgs. at 323 (Walda W. Roseman,'NPR). But commercialization, as that term is commonly understood, deals with commerce; it says nothing at all about advertising for political candidates or oh issues of public interest.'
The majority also points to a few comments suggesting that Congress feared the influence of political interests. Jack Gol-odner, of the AFL-CIO, for example, advocated that public broadcasting be “insulated from political, corporate, and, for that matter, labor influence.” See id. at 112. Congressman Gonzales similarly em *1214 phasized the need to “insulate public broadcasting from special interest influences — political, commercial, or any other kind.” 127 Cong. Rec. 13145 (1981). But such general concerns about insulating public television from a variety of influences say nothing about advertising. No one explained, much less provided evidence, how. allowing stations to accept paid advertising from politicians would make them subject to influence by those politicians. No one said a word about influence by organizations that sponsor issue ads. Stray comments, unsupported by facts, may be enough to support legislation under the all-forgiving rational basis test, but intermediate scrutiny surely calls for more.
There are other lacunae in the legislative record. No one explains why political and issue ads are dangerous, if advertising for non-commercial entities (including product ads) isn’t. If legislators feared influence, why didn’t they worry about stations falling under the sway of non-commercial entities? The list of non-commercial entities is vast. Many are poorly funded and non-controversial (such as some museums and theater groups), but others are quite wealthy and influential, including advocacy groups, churches, foundations, think tanks and fraternal organizations. The legislation forbids non-profit organizations from advertising about matters of public concern or candidates for public office. But nothing prevents them from advertising themselves and the services they offer, and thereby presumably influencing the programming of public broadcast stations. If there are reasons why influence by the Westboro Baptist Church, Heritage Foundation, Planned Parenthood, National Rifle Association, Middle East Research Institute, Family Research Council, Media Matters for America and AARP poses less of a threat than influence by entities commenting on issues of public importance or candidates for public office, they are nowhere to be found in the legislative record.
Even if we look at the evidence developed after the legislation was passed— some of it decades later — there isn’t much to support the ban on political and issue ads. The majority cites a magazine article stating that in 2008, $2.2 billion was spent on political advertising. Maj. op. 1206. So what? Where’s the evidence that public broadcasters would suffer adverse consequences if they were allowed to run such ads? We can’t assume that political campaign ads will have the same adverse effects attributed to commercial ads (more on this later). Political ads are inherently more transitory and episodic — centering on a particular campaign season, ballot issue or candidate — so it’s far from clear that they would present the same capture problem attributed to ads for commercial products, whose producers are in the market for the long haul. Nobody bothers to explain the connection, and yet the majority sees no problem. This is hardly rational basis review, much less intermediate scrutiny.
And the new evidence says nothing at all about issue ads. Neither of the expert affidavits (such as they are) even mentions them. There is no magazine article suggesting there are billions of dollars in issue ads gearing up to invade the public airwaves. No one suggests that sponsors of issue ads are waiting voraciously in the wings, yearning to pressure public broadcast stations into changing their programming. Not a word. Nor is there a hint of a suggestion that issue ads are out of keeping with the high-brow character of public television. And, of course there can’t be, because issue ads are about ideas. Where’s the beef?
Issue ads can be quite important from a First ' Amendment perspective. Aside from generating revenue, which public *1215 television and radio stations can use to produce more and better programming, issue ads can help educate the public about some of the most significant questions of the day: whether to take military action against foreign nations; whether private individuals should have the right to carry-concealed weapons; whether minors are entitled to undergo certain medical procedures without their parents’ consent; whether we should have capital punishment, and for what crimes; whether undocumented aliens should be given a path to citizenship; how the tax burden should be allocated; whether same-sex couples should be allowed to marry; whether the government should be reading our e-mails or listening to our phone calls.... The list is endless. How exactly would public broadcasting as we know it be harmed by allowing a limited number of paid issue ads that don’t interrupt programming? My colleagues give the issue ban a pass, based entirely on the momentum supposedly created by the ban on commercial advertising. This isn’t intermediate scrutiny; it’s zero scrutiny.
Which brings us to the one debatable issue — the ban on advertisements for commercial products and services, which was at the center of congressional concern when the 1981 Act was passed. There was, indeed, much hand-wringing about the dangers of commercialization, most of which the majority references in its opinion. But there’s nothing that one might call evidence. The legislation was designed to deal with the problem of drastically diminished federal funding for public broadcast stations, and the need for those stations to raise money from other sources. Congress considered several fund-raising possibilities, among them various flavors of commercial advertising, including logograms, institutional advertisements (promoting companies rather than specific products) and commercial advertising. It’s fair to say that none of the witnesses thought commercial advertising was a good idea, and most thought it would significantly harm public broadcasting.
Their concerns can be divided into roughly 4 categories: (1) that adding commercial advertising would force changes in program format and cause public broadcasting to lose its distinctive character; (2) that broadcasters’ ability to raise money commercially would cause subscribers and other non-commercial sources of funding to withdraw support; (3) that the need to raise revenue through commercial advertising would necessitate changes in programming content, so as to attract larger audiences, leaving no airtime to serve audiences with less popular tastes; and (4) that there would be an increase in various costs, ranging from increased labor costs to the payment of additional royalties for copyrighted materials to loss of various statutory benefits. In the aggregate, the witnesses fretted, allowing commercial advertising would dramatically change the character of public broadcasting, defeating its mission of serving audiences not served by commercial stations.
These are certainly weighty concerns, but what’s remarkable about the testimony presented to Congress is that they are nothing but concerns. The legislative record contains no documentation or evidence; there are no studies, no surveys, no academic analyses — nothing even as meaty as the rather anemic expert reports introduced by the government in our case. Sure, a lot of people worried that commercial advertising would wreck public broadcasting, but people worry about a lot of things that never come to pass. See, e.g., Peter- Gwynne, The Cooling World, Newsweek, April 28, 1975, at 64. Where’s the proof, or even the rigorous analysis, showing that the matters worried about were likely to occur? It’s certainly not in the legislative record.
*1216 I know it’s difficult to prove with certainty what the future will bring. See, e.g., Turner Broad. Sys. v. FCC (Turner I), 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Nevertheless, if we’re conducting some level of heightened scrutiny, not merely rational basis review, we should insist on something more than a bunch of talking heads bloviating about their angst. We should expect, for example, a study of how public broadcast stations actually operate, how they differ in their governance and structure from commercial stations and whether those differences have any bearing on how they are likely to respond if they were allowed to raise money through commercial advertising. Or, witnesses might have presented historical examples shedding light on the likelihood of future behavior, or the experience of broadcast stations in other countries. But there’s nothing like that; we’re left to take on faith that the witnesses’ fears are justified. Such faith isn’t consistent with the heightened scrutiny courts are supposed to give legislation that abridges the freedom of speech.
In fact, there was a great deal that Congress could have considered before resorting .to such strict speech restrictions— things we may not ignore in judging the legislation under heightened scrutiny. We must consider whether the speculation about the dangers of commercial, advertising makes sense in light of all the known circumstances, just as the Court did in League of Women Voters, 468 U.S. at 385-99, 104 S.Ct. 3106. The concerns expressed by the various witnesses about the dangers of commercial advertising boiled down to the fear that it would change public broadcasting into a more commercial enterprise, which would disserve the segment of the public not being adequately served by commercial broadcasting.
Does this make sense? Commercial broadcasters operate the way they do precisely because they’re commercial entities, whose purpose is to make profits for their shareholders. Managers of commercial broadcast stations and networks thus generally measure their success based on the broad popularity of their shows and the revenue they generate as a result of commercials and subscriptions. We call this capitalism, and we’re perfectly content to have the laws of supply and demand control the behavior of commercial entities.
.But we don’t observe non-commercial entities operating by the same rules: Museums, charities, churches, universities, hospitals, theater companies, musical ensembles and a large variety of other organizations operate on a non-profit basis, even as similar institutions (e.g., hospitals, museums, universities, theaters) operate side-by-side with them on a commercial basis. The lure of profit doesn’t cause charitable institutions to abandon their missions and reinvent themselves as commercial entities: The Red Cross doesn’t go into the business of selling blood or charging for rescue missions because there’s a quick buck in it; the Met doesn’t swap programs with the Grand Ole Opry because it thinks it ean make more money playing country music; and food banks don’t start charging prices that match those of the supermarket across the street.
We understand perfectly well why this is so. Charitable and civic organizations have charters and other organizational constraints that tie them to their mission; they have a variety of governmental regulations and incentives that keep them from straying into the commercial arena; they have managers and staff who are dedicated to the organization’s core purpose; and they have boards of directors who supervise them to ensure they stick to it. Just as important is what they don’t have: shareholders who demand a return on their investments. Charitable and civic *1217 organizations intrinsically operate by different rules than commercial entities, and it would never occur to us to pass laws prohibiting the Los Angeles County Museum of Art from selling automobiles and dishwashers, even though the sale of such items might well be profitable and allow the museum to acquire more and better art.
It thus seems wholly irrational to make undocumented claims about the likely behavior of public broadcast stations, were they allowed to air advertisements, without first considering the ways in which they differ from commercial entities. And the differences are huge. To begin with, public broadcasters must, by law, operate as non-profit entities. 47 C.F.R. § 73.621. They must be owned by “a public agency or nonprofit private foundation, corporation, or association,” or by a municipality. 47 U.S.C. § 397(6). Any station that isn’t owned or operated by a state, political subdivision of a state or a public agency must have a community advisory board. 47 U.S.C. § 396(k)(8)(A). In fact, universities operate most public radio stations, while non-profit community organizations and state government agencies operate most public television stations. See Corporation for Public Broadcasting, Who Operates the Stations?, http://www.cpb.org/ aboutpb/faq/operates.html.
Federal funding for public broadcasting stations is also conditioned on their maintaining programming that is consistent with the goals of the statute. Federal funds are distributed by the Corporation for Public Broadcasting, which may make grants “for production of public television or radio programs by independent producers and production entities and public telecommunications entities, producers of national children’s educational programming, and producers of programs addressing the needs and interests of minorities, and for acquisition of such programs by public telecommunications entities.” 47 U.S.C. § 396(k)(3)(B)(i).
Finally, licenses for public broadcast stations aren’t handed out on a first-come, first-served basis. In deciding whether to grant an application for a license, the FCC favors: (1) “local applicants ... who have been local continuously for no fewer than two years”; (2) applicants with “no attributable interests.... in any other broadcast station”; (3) public or private entities “with authority over a minimum of 50 accredited full-time elementary and/or secondary schools within a single state”; (4) accredited public or private institutions of higher learning “with a minimum of five full time campuses within a single state”; and (5) organizations that will “regularly provide programming for and in coordination with [statewide educational] entities]” for use in schools’ curricula. 47 C.F.R. § 73.7003. Further, to receive a license, the potential station owner must show that the proposed station will “be used primarily to serve the educational needs of the community; for the advancement of educational programs; and to furnish a nonprofit and noncommercial television broadcast service.” 47 C.F.R. § 73.621.
None of those who presented “evidence” — better characterized as Chicken Littleisms — about the calamitous effects of allowing commercial (and political and issue) advertising on public broadcasting took the slightest account of these structural constraints. They all predicted that the lure of advertising dollars would turn public broadcasters into commercial broadcasters. But is it rational to believe that public broadcast stations operated by municipalities, universities and non-profit foundations would risk losing federal funding (and perhaps their FCC licenses) by abandoning their traditional viewership in order to compete with commercial stations for advertising dollars? This strikes me as *1218 about as likely as the Smithsonian turning itself into Busch Gardens because it decides that roller coaster rides are more popular than mastodon skeletons.
Still and all, had Congress been presented with evidence that public broadcast stations could be diverted from their mission by the lure of lucre, despite the multitude of structural obstacles — had anyone even mentioned this as a consideration — I might feel constrained to defer to the congressional judgment. But no one paid any attention to the obvious differences between non-profit and commercial entities, and how they respond to market incentives — even though there is a well-developed branch of economics that deals with precisely this subject. See, e.g., Burton A. Weisbrod, The Nonprofit Economy (1988); Susan Rose-Ackerman, Altruism, Nonprofits, and Economic Theory, 34 J. Econ. Lit. 701 (1996); Joseph P. Newhouse, Toward a Theory of Nonprofit Institutions: An Economic Model of a Hospital, 60 Am. Econ. Rev. 64 (1970).
What’s more, we know for a fact that some of the witnesses who testified before Congress in 1981 were wrong. Three of the witnesses, each of whom was worried sick about the potentially catastrophic effects of commercialization on public broadcast stations, also made dire predictions about the pernicious use of logograms. Oy vey! Congress nevertheless adopted that provision, and logograms have been in use in public broadcasting for over a quarter of a century. And, know what? The Cassandras were wrong;- public broadcasting as we know and love it has survived just fine — perhaps a tad better, as underwriting, including logograms, generates much-needed revenue for public broadcasting. See NPR, Public Radio Finances, http:// www.npr.org/about-npr/178660742/public-radiofinances.
Congress knew that predictions about how commercial advertising would affect public broadcast stations were speculative. It therefore sought to develop empirical evidence by authorizing an experiment that would allow public broadcasters to air commercial advertising and expanded underwriting credits. A temporary commission was established to study the project and report back to Congress. The majority alludes to this study in its opinion, claiming that it supports its position, Maj. op. 1209-10, but I read the study very differently.
While written in cautious and somewhat tentative terms, the report contained a number of findings and conclusions that severely undermine the doomsday predictions made by witnesses before Congress and accepted as Gospel Truth by the majority today. Specifically, the Commission found as follows:'
• “Limited advertising and expanded underwriting credits both generated revenues in excess of reported expenses.” Such revenues “equaled about 8.1 percent of the stations’ total net income.”
• “In several cases, advertising revenues permitted stations to acquire specific programs that they otherwise could not have afforded to purchase.... The demonstration program did ... suggest that (at least where advertising or expanded underwriting revenue is only one source among many) no movement toward programming changes resulted.”
• “[Wjhile most subscribers and regular viewers reported initially that they would watch less public television if advertisements were present, the second wave of the survey showed no differences in the amount of time these groups reported watching.”
• “Although a first wave response suggested that 20 to 40 percent of public television subscribers might reduce their contributions, the second wave of *1219 the opinion poll showed no significant differences in the overall amount of giving reported. Additionally, the poll showed an increase in the number of subscribers who reported that they would continue to contribute to public television.” .
• “Analysis of subscription revenues at participating stations showed ... [a]n increase in total number of subscribers and contributors at all stations compared with the previous year; [n]o significant differences in total number of subscribers or total contributions compared to the control group [stations that did not carry advertising]; [a] significant decline in average contribution per subscriber at advertising stations compared to the control group [which] suggests that carriage of limited advertising may have affected giving by large contributors. The decline, however, also could reflect an influx of new subscribers contributing smaller amounts to the stations involved.”
It is true, as the majority notes, that the Temporary Commission recommended maintaining the advertising ban, despite these positive findings. Instead of raising revenue through advertising, the Commission recommended enhanced federal funding for public broadcasting — at least the majority did. For this, they were taken to task by the Minority Report, authored by the National Telecommunications and Information Administration, an executive agency within the Department of Commerce. The minority decried the fact that “[t]he majority report ... does not fully and fairly reflect the overwhelmingly positive results of the advertising demonstration experiment itself____The majority, in short, seems to have rejected the Congressional directive that we come up with some new lyrics and appears content instead simply to sing what by now is a very familiar song.” It’s a song that echoes loud and clear in today’s majority opinion, three decades later. Pointing out that “the public’s money is the easiest of all money to spend — because it doesn’t seem to belong to anyone,” the minority chastised the majority for “continuation of the ‘cargo cult’ approach all have seen before.” Ditto.
Here is how the Minority Report summarized the results of the demonstration program: “The evidence produced by the advertising demonstration program is almost completely positive and affirmative. In no instance did the findings indicate any significant adverse consequences with respect to these matters.” The demonstration program “confirmed the view that people watch and support public television because they like and enjoy the programming, not just because it is ‘commercial free.’ ” The Commission’s polling data, for example, revealed that “no significant audiences were in fact alienated,” and that stations were able to generate significant revenues. Although the minority conceded that there were risks to allowing public broadcasters to air paid advertisements, because of the significance of the potential gains, it concluded that “the sounder course for the Temporary Commission would have been to place maximum reliance on informed licensee discretion, and minimum weight on the utility of Washington-imposed constraints.”
The significance of the demonstration program can’t be overstated: It is the only evidence in the record about the real-life consequences of allowing public broadcast stations to run commercial advertisements. And the experience is overwhelmingly positive. The demonstration program points to yet another gap in the majority’s reasoning — the failure to appreciate or accord any weight to the serious adverse free speech consequences of the advertising ban. The record suggests three:
*1220 First, as the demonstration program illustrates, stations that receive paid advertising revenue can acquire or produce programs that they could not otherwise afford. Thus, the loss of advertising revenue can’t be dismissed as simply a loss of money; it is, in fact, a loss of speech. We know for a fact (from the demonstration program) that there are stations wishing to run content that is consistent with their educational and civic mission but can’t afford to do so. Advertising revenue would allow public broadcast stations to acquire content that will serve their audiences. Additional revenue would also enable stations to produce local content, which is one of the identified goals of public broadcasting, rather than relying on content produced nationally or abroad.
Second, an infusion of additional nongovernmental revenue would help public broadcast stations gain independence from the federal government. The record before Congress, and the record in our case, makes it clear beyond dispute that public broadcast stations are desperately dependent on federal subsidies. Can broadcasters that "are so dependent on one source of revenue be truly free to speak in ways that are critical of that source? Would public broadcasters feel free to run a program exposing corruption by, say, the chairman of the relevant appropriations committee? My guess is that any station wishing to produce such a program would be dissuaded from doing so. Washington-is a small town with a long memory, and no one wants to get into a grudge match with the goose that lays golden eggs. The only true independence, the only truly free speech, comes from having a multitude of funding sources, so that none is so crucial that it can’t be dispensed with. Deriving a portion of revenue from commercial advertising, along with other sources, can help secure that independence.
Third, , advertisements are speech. Viewers often see commercials as no more than annoying interruptions, but the Supreme Court has recognized that advertisements often carry important, sometimes vital, information. See, e.g., Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (lawyer advertising); Virginia State Bd. of Pharmacy. v. Virginia Citizens Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (prescription drug prices); Rubin v. Coors Brewing Co., 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (beer labels). Advertisements can be for annoying, useless or decadent products, but they can also encourage people to get breast exams, http://goo.gl/MM6sV9; join the peace corps, http://goo.gl/bfBmiy; get a smoke alarm, http://goo.gl/wChmNO; prevent forest fires, http://goo.gl/HrCxQG; vote, http://goo.gl/do9TCc, etc., etc. Excluding advertising from public broadcasting deprives viewers of the opportunity to obtain such important information.
The statute’s ban on issue advertising (for which, remember, no one gives any justification at all, see p. 1214 supra) is particularly troubling, as it deprives public broadcast audiences of precisely the type of information we expect an informed public to have: how to vote on issues of public importance, http://goo.gl/6CRk3J, http:// goo.gl/XLrL9A, http://goo.gl/TL6BQU; the state of public health, http://goo.gl/PXI 7am; and the performance and funding of our public schools, http://goo.gl/lBRQJu. Campaign ads can make or break presidential elections, see, e.g., http://goo.gl/6o Grfy, http://goo.gl/fnFbkh; http://goo.gl/vO Ju. Can we say that there is really a substantial — or even a rational — justification for precluding public broadcast audiences from being educated on issues of public importance? Is it consistent with the principles of an informed electorate to deprive those who watch public television *1221 and listen to public radio of -an important source of information?
I understand the concern about turning public broadcasting into something that is quite different from what it is today. But why aren’t the structural constraints, discussed above, sufficient to prevent this? And, if we fear they’re not, there are many intermediate restraints, far short of a complete prohibition. The Temporary Commission suggested limiting the duration and placement of advertisements, and ensuring diversity of funding (perhaps by placing a limit on the percentage of revenue any station could derive from any single source). Surely, anything is better from a free speech perspective than an outright and total ban, yet Congress seems to have given this possibility no consideration. Nor does the majority.
I add only a few words about the two expert declarations presented by the defendant in the district court; they deserve no more. Assuming that it’s possible to supplement the legislative record decades after the legislation is passed — which to my mind is still an open question, see Turner I, 512 U.S. at 671-74, 114 S.Ct. 2445 (Stevens, J., concurring) — these experts add nothing to the debate. The Ozier declaration parrots the worries expressed by the witnesses before Congress. He predicts that alternative sources of funding would dry up, that stations' would yield to pressure from advertisers to change their programming, that foundations would withdraw their support and that various concessions now enjoyed by public television would be jeopardized. Ozier provides no new facts, just the same lame predictions previously made by others — and largely refuted by the experiment conducted by the Temporary Commission following the passage of the 1981 legislation.
The Noll affidavit does add some new matter, mostly irrelevant. For example, Noll comments adversely on the “advertising of nutritionally undesirable food and ... the inclusion of violent content” in commercial stations, and reports that “[rjesearch has shown that violent program content causes antisocial behavior among children and food advertising to children promotes an unhealthy diet that causes obesity.” What this has to do with the matter under consideration is unclear; it seems at times like Professor Noll prepared his declaration for another client and then adapted it to this case.
In the parts of the declaration that do bear on our case, he pretty much embraces the cargo cult attitude alluded to by the Minority Report of the Temporary Commission, calling for “replacing] advertising with government subsidies as the main source of revenues.” For this you need a Ph.D.?
Noll also concludes, without much support or analysis, that public broadcast stations would have to change the nature of their programming to generate significant revenue. This conclusion is flatly contradicted by the experiment conducted by the Temporary Commission, which found that stations could gain substantial revenue without changing their content. See p. 1218-19 swpra. Noll doesn’t mention the Temporary Commission’s Report, preferring to rely on his own intuition rather than inconvenient real-world evidence. Nor does Noll discuss, or even acknowledge, the structural constraints that would likely prevent public broadcast stations from reinventing themselves as commercial stations. I might not go so far as to say the Noll report is irrational, but it certainly doesn’t carry the kind of heft — in light of all the other available evidence— that the Supreme Court’s analysis in League of Women Voters demands.
In sum, the evidence presented by the government in support of these speech *1222 restrictions simply doesn’t pass muster under any kind of serious scrutiny — the kind of scrutiny we are required to apply when dealing with restrictions on speech. Even if intermediate scrutiny applies — and I doubt that it does, see pp. 1222-23 infra— there is simply not enough there to satisfy a skeptical mind that the reasons advanced are rational, let alone substantial.
II
Because “[t]he text of the First Amendment makes no distinctions among print, broadcast, and cable media,” Denver Area Educ. Telecomms. Consortium, Inc. v. FCC, 518 U.S. 727, 812, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (Thomas, J., concurring in the judgment in part), Red Lion and Pacifica represent a jarring departure from our traditional First Amendment jurisprudence. As Justice Thomas explained in his lucid concurrence in Fox Television, “Red Lion and Pacifica were unconvincing when they were issued, and the passage of time has only. increased doubt regarding their continued validity.” 129 S.Ct. at 1820. Justice Thomas’s words echo the views of Chief Judge Emeritus Harry Edwards in Action for Children’s Television v. FCC, 58 F.3d 654, 673 (D.C.Cir.1995) (en banc) (Edwards, J., dissenting): “There is no justification for this apparent dichotomy in First Amendment jurisprudence. Whatever the merits of Pacified when it was issued[,] ... it makes no sense now.”
Today, Red Lion looks even more quaintly archaic than at the time Judge Edwards and Justice Thomas made their observations. To start, the broadcast spectrum has vastly expanded, due in part to advances in technology, including the “switch.from analog to digital transmission, which ... allow[s] the FCC to ‘stack broadcast channels right beside one another along the spectrum.’ ” Fox Television, 129 S.Ct. at 1821 (Thomas, J., concurring) (quoting Consumer Elees. Ass’n v. FCC, 347 F.3d 291, 294 (D.C.Cir.2003)). And “traditional broadcast television and radio are no longer the ‘uniquely pervasive’ media forms they once were. For most consumers, traditional broadcast media programming is now bundled with cable or satellite services.” Id. at 1822. This trend has continued and accelerated, with the delivery of much content by way of cellular networks and the internet. See, e.g., Jim Edwards, People Now Spend More Time Watching Their Phones than Watching TV, Business Insider (Aug. 15, 2012), http://goo.gl/jtrVNk; AJ Marechal, CW Offers ‘Husbands,’ More Web Fare from Digital Studio, Variety.com (Mar. 27, 2013), http://goo.gl/Cww32h; Maura McGowan, Original Series Help Ne tflix Turn a Tidy Profit, Adweek (Apr. 23, 2013), http://goo.gl/9oy0gb; Procon.org and Pivottv Join Forces on Critical Thinking Campaign, Procon.org (Sept. 13, 2013), http://goo.gl/ibGNlt; Jon Robinson, New ‘Madden’ Includes NFL Sunday Ticket, ESPN Playbook (May 17, 2013), http://goo.gl/gKJRVZ; Alex Stedman, Disney Invites Kids To Bring iPads to Theaters for ‘The Little Mermaid’ Re-Release, Variety.com (Sept. 11, 2013), http://goo.gl/ YjEfUw; Esther Zuckerman, Netflix Has Done It Again: ‘Orange Is the New Black’ Has ‘Astounded’ the Critics, The Atlantic Wire (July 2, 2013), http://goo.gl/mML64G.
For reasons explained at length above, I don’t think the standard of review matters very much to the outcome in this case; the restrictions on advertising by public broadcast stations fail any standard of review more rigorous than a straight-face test. But under an intermediate standard of review, the result is highly unpredictable, as judges of intelligence and good faith can view the situation very differently. This isn’t because judges have failed; the standard itself promotes uncertainty. Because there are no absolutes, judges are left to exercise their judgment based on their personal experiences and predilections.
*1223 “Liberty finds no refuge in a jurisprudence of doubt.” Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 844, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Nowhere is this truer than in the case of speech, which is especially vulnerable to uncertainties in the law. This is why we have special doctrines applicable to speech only. For example, we allow those whose rights haven’t been violated to bring suit, and we’ll strike down a law, even if it has some constitutional application, if it’s substantially overbroad. See, e.g., Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965); see also N.Y. Times v. Sullivan, 376 U.S. 254, 272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (freedom of speech requires “breathing space” (internal quotation marks omitted)). It is our constitutional duty to make the law of free speech clear and predictable.
To the extent Red Lion was justified by the state of technology at the time it was written, it’s certainly not justified by the state of technology today. The bottlenecks and monopolies that existed in the field of mass communications when Red Lion was decided no longer exist. It’s one of the oldest maxims of the common law that once the reason for a rule ceases, the rule itself disappears. It’s a maxim the Supreme Court recognizes and expects inferior courts to honor. See Funk v. United States, 290 U.S. 371, 385-87, 54 S.Ct. 212, 78 L.Ed. 369 (1933). We shouldn’t turn a blind eye to the vast technological changes in the field of mass communications that make broadcasting less significant and pervasive every day. We not only have the right, but also the constitutional duty, to brush aside a precedent— venerable though it may be — when its rationale has been hollowed out as if by termites.
I would strike down as unconstitutional the statute and corresponding regulations that prohibit public broadcast stations from carrying commercial, political or issue advertisements. I would reverse the district court and remand with instructions that summary judgment be granted in favor of the plaintiffs. And I would set public television and radio free to pursue its public mission to its full potential. We’d all be better off for it.