# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 19, 2016        Decided March 8, 2016

No. 14-5259

ARK INITIATIVE, ET AL.,
APPELLANTS

v.

THOMAS L. TIDWELL, CHIEF, U.S. FOREST SERVICE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00633)

*William S. Eubanks II* argued the cause for appellants. With him on the briefs was *Eric R. Glitzenstein*.

*James Maysonett*, Attorney, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief was *John C. Cruden*, Assistant Attorney General. *Katherine J. Barton*, Attorney, entered an appearance.

*Ezekiel J. Williams* and *Steven K. Imig* were on the brief for intervenor-appellee Aspen Skiing Company.

*Cynthia H. Coffman*, Attorney General, Office of the Attorney General for the State of Colorado, *Federick R. Yarger*, Solicitor General, *Casey A. Shpall*, Deputy Attorney

General, and *Scott Steinbrecher*, Assistant Solicitor General, were on the brief for *amicus curiae* the State of Colorado in support of appellee.

*John M. Bowlin* and *David S. Neslin* were on the brief for *amicus curiae* Colorado Ski Country USA, Inc. in support of defendant-appellees and intervenor-appellee.

Before: BROWN, KAVANAUGH and PILLARD, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:  The U.S. Forest Service in the Department of Agriculture generally prohibits road building and timber cutting on its inventoried "roadless" national forest lands.  Responding to a petition by the State of Colorado, in 2012 the Service promulgated a rule adopting State-specific standards for the designation and management of the inventoried roadless areas within Colorado's borders.  *Special Areas; Roadless Area Conservation; Applicability to the National Forests in Colorado* (2012 Colorado Rule), 77 Fed. Reg. 39,576 (July 3, 2012) (codified at 36 C.F.R. §§ 294.40-294.49).  At issue in this case is the 2012 Colorado Rule's exclusion from the 4.2 million acres of inventoried roadless land in Colorado of about 8,300 acres of land that the Service also has designated for recreational skiing.  The practical effect of the decision is to exempt that skiing acreage from the Service's ban against road building and timber cutting on roadless lands, although any such developments remain subject to environmental review under the National Environmental Policy Act.

The plaintiffs—environmental organizations and two individuals—challenge the Service's application of the 2012

Colorado Rule to allow development of a proposed egress ski trail on once-roadless land within the Special Use Permit boundary for the Snowmass Ski Resort in Aspen. The proposed trail is not a paved road, but a trail approximately 3,000 feet long and averaging 35 feet wide that would require some spot grading and tree and brush cutting to make it usable by skiers and emergency-response patrollers and to open part of it to grooming vehicles. Plaintiffs contend that the Service adopted the ski-area exclusion with reference to factors other than the on-the-ground, undeveloped condition of the 8,300 affected acres, thereby deviating from its own established policy without sufficient explanation. The plaintiffs also claim that the Service gave them insufficient notice of the rulemaking. The District Court disagreed, concluding that the Service offered ample reasons for its decision to exclude existing designated ski areas from the Colorado roadless inventory, and that the Service's six-year public rulemaking process satisfied all applicable notice requirements. *See Ark Initiative v. Tidwell*, 64 F. Supp. 3d 81 (D.D.C. 2014). Because we agree that the Service adequately explained the limited ski-area exclusion and did not violate any applicable notice requirements, we affirm.

## I.

### A.

The Service generally manages its national forest lands for multiple uses, as authorized by a layered set of national forest management laws reaching back more than a century. *See generally Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1221-22 (10th Cir. 2011); *Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 226-27 (D.C. Cir. 2009). The Organic Administration Act of 1897, 16 U.S.C. §§ 473 *et seq.*, requires the Service to manage national forests to secure

4

favorable conditions of water flows and to furnish the nation with a continuous supply of timber, *id.* § 475. The 1960 Multiple-Use Sustained-Yield Act, 16 U.S.C. §§ 528 *et seq*., adds "outdoor recreation, range, timber, watershed, and wildlife and fish purposes" to the list of the Service's objectives for forest land management, *id.* § 528, and specifies that renewable surface resources must be administered "for multiple use and sustained yield," *id.* § 529. To serve those goals, the National Forest Management Act of 1976, 16 U.S.C. §§ 1600 *et seq*., requires the Service to develop land and resource management plans, also called forest plans, which, much like zoning restrictions, designate certain areas of national forest lands for specified uses, *id.* § 1604(a), (e)(1). The Service also may issue permits for development within national forests pursuant to various authorities, consistent with governing forest plans. *Id.* § 1604(i). As relevant here, under the National Forest Ski Area Permit Act of 1986, 16 U.S.C. § 497b, the Service issues long-term special-use permits for skiing and other recreational activities on lands within the National Forest System. Approximately 6,600 acres of land at issue in this case were covered by special-use ski-area permits, with the remaining 1,700 excluded acres designated for skiing under forest plans.

Some national forest lands are subject to especially stringent management constraints. In 1964, Congress passed the Wilderness Act, 16 U.S.C. §§ 1131 *et seq*., obligating the Service to review "primitive" lands in the National Forest System to determine their suitability for preservation as "wilderness," *id.* § 1132(b)-(c), a designation that carries with it strict development and use prohibitions for permanent protection of an area's "recreational, scenic, scientific, educational, conservation, and historical use," *id.* § 1133(b). In the 1970s, the Forest Service completed its Roadless Area Review and Evaluation project to fulfill the Wilderness Act's

mandate that it inventory extensive primitive areas of federal lands potentially suitable for congressional wilderness designation. *See Wyoming*, 661 F.3d at 1221-22. As a result of that effort and the wilderness designations included in the Wilderness Act itself, *see* 16 U.S.C. § 1132(a), Congress has designated approximately 35 million acres as wilderness lands, *see Wyoming*, 661 F.3d at 1222.

The Service by 2001 had inventoried as "roadless" 58.5 million acres of relatively undisturbed land nationwide that did not make the congressional wilderness-designation cut, an area constituting about a third of national forest lands and 2% of the land mass of the continental United States. *See id.* at 1222, 1225; *Special Areas; Roadless Area Conservation* (2001 Roadless Rule), 66 Fed. Reg. 3244, 3245-46 (Jan. 12, 2001). Before 2001, the Service regulated those inventoried roadless areas under governing forest plans, dictating their use and development on a local, "site-specific basis," with no nationwide management standards. *Wyoming*, 661 F.3d at 1222; *see* 66 Fed. Reg. at 3246. During that time, roadbuilding degraded approximately 2.8 million acres of inventoried roadless areas. 66 Fed. Reg. at 3246.

Concerned about further degradation, the Service promulgated the 2001 Roadless Rule, a national roadless policy that looked at "the 'whole picture' regarding the management of the National Forest System." *Id.* at 3246. Subject to preexisting permits, the 2001 Roadless Rule generally "prohibits road construction, reconstruction, and timber harvest in inventoried roadless areas because [those activities] have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics." *Id.* at 3244. By "roadless area characteristics," the Service refers not only to the absence of roads as such, but also to beneficial

environmental features typical of roadless areas or otherwise relatively undisturbed forest lands, such as high-quality and undisturbed soil, water, and air; plant and animal diversity and habitat for various sensitive categories of species; and scenic and cultural properties. *See id.* at 3245.

In 2005, the Service again changed course, shifting to a state-centered regime for managing roadless areas by inviting states to petition for federal approval of state-specific management approaches to inventoried roadless lands within their borders. *See Special Areas; State Petitions for Inventoried Roadless Area Management* (State Petitions Rule), 70 Fed. Reg. 25,654 (May 13, 2005). The State Petitions Rule was short-lived. In response to challenges by a handful of Western states and many environmental organizations, the Ninth Circuit sustained a district court order enjoining the State Petitions Rule because it had been adopted without the requisite environmental analysis under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, as enforced through the Administrative Procedures Act (APA), 5 U.S.C. §§ 701 *et seq.*, and without consultation about potential effects on endangered species as required by the Endangered Species Act (ESA), 16 U.S.C. §§ 1531 *et seq. See Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1011-19 (9th Cir. 2009), *aff'ing Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874 (N.D. Cal. 2006). The court order reinstated the 2001 Roadless Rule that had previously been in force nationwide. *See id.* at 1019-21.

By that time, however, the State of Colorado already had seized the opportunity to request federal approval of management of its 4.2 million acres of roadless areas in a manner tailored to state needs. The State created a bipartisan task force in 2005 to compile recommendations for a

Colorado-specific roadless-area management rule. In 2006, Colorado filed a petition for rulemaking with the Service. By the time Colorado filed its petition, the Ninth Circuit had struck down the State Petitions Rule and reinstated the 2001 Roadless Rule, *Cal. ex rel. Lockyer*, 575 F.3d at 1020-21, but Colorado submitted its rulemaking petition under both the State Petitions Rule, in the event it was later reinstated, and section 553(e) of the Administrative Procedure Act, 5 U.S.C. § 553(e), in case the State Petitions Rule remained invalid, as it has to date. Colorado's petition requested, as relevant here, a roadless area "boundary adjustment" to eliminate a relatively small area of overlap of designated ski areas and roadless lands by excluding those overlapping portions from roadless inventory. Colorado Roadless Petition (2006) at 7, 17, J.A. 232, 242.

After a lengthy rulemaking process involving numerous layers of environmental review, broad public participation, and consideration of four alternatives, the Service promulgated the 2012 Colorado Rule. *Special Areas; Roadless Area Conservation; Applicability to the National Forests in Colorado*, 77 Fed. Reg. 39,576 (July 3, 2012). The 2012 Colorado Rule emphasized the need to "provide for the conservation and management of roadless area characteristics," especially from tree cutting or removal and road construction, but also revised the inventory and management of roadless lands in Colorado based on Colorado's representation that "flexibility is needed to accommodate State-specific situations and concerns in Colorado's roadless areas." *Id.* at 39,577. The 2012 Colorado Rule displaces for that State the nationwide 2001 Roadless Rule. [1] *See* 36 C.F.R. § 294.48(g).

---

[1] Idaho is the only other State subject to a state-specific roadless rule. *See Special Areas; Roadless Area Conservation; Applicability*

In some ways, the 2012 Colorado Rule is more protective than the national rule. For example, it adds 409,500 new acres to the Colorado roadless inventory, 77 Fed. Reg. at 39,577, and designates more than a million acres of inventoried roadless areas as "upper-tier" roadless lands subject to more stringent restrictions on roadbuilding, tree cutting, and linear construction (such as power and telecommunication lines) than the national rule imposes, *see* 36 C.F.R. §§ 294.42(b), 294.43(b), 249.44(b); 77 Fed. Reg. at 39,577-78. The Service explicitly included those features "to offset the limited exceptions for Colorado-specific concerns so that the final rule is more protective than the 2001 Roadless Rule." 77 Fed. Reg. at 39,578.

The 2012 Colorado Rule has other, less protective features. For example, it makes certain exceptions from its road-building and timber-cutting prohibitions to facilitate wildfire management, *see* 36 C.F.R. §§ 294.42(c)(1)-(2), 294.43(c)(1)(vi)-(vii), and removes from the roadless inventory 459,100 acres the Service "determined to be substantially altered," 77 Fed. Reg. at 39,577-78. As pertinent here, and as requested by the State, the 2012 Colorado Rule also removed from the roadless inventory approximately 8,300 acres of land the Service already had designated "for ski area management" through special-use permits or forest plans. *Id.* at 39,578.

The Service explained in the preamble to the final rule its reasons for adopting the ski-area exclusion—the centerpiece of this case. *Id.* According to the Service, the twenty-two ski areas located in part on public lands managed by the Service "received about 11.7 million skier visits during the 2010-2011

---

*to the National Forests in Idaho*, 73 Fed. Reg. 61,456 (Oct. 16, 2008); *see also Jayne v. Sherman*, 706 F.3d 994 (9th Cir. 2013).

ski season" and "Colorado skiers spend about $2.6 billion annually, about one third of the annual tourist dollars spent in the State." *Id.* The Service noted that the existing roadless inventory encompassed lands within parts of thirteen ski areas that also fall within a permit boundary (about 6,600 acres) or an area that a forest plan allocates for management as a ski area (about 1,700 acres). *Id.* at 39,578, 39,594. Those 8,300 acres amount to less than 0.2% of Colorado's inventoried roadless areas. *Id.* at 39,578. The Service also asserted that the 8,300 acres at issue here "include[] roadless acres with degraded roadless area characteristics due to the proximity to a major recreational development." *Id.* The ski-area exclusion, the Service reasoned, "will ensure future ski area expansions within existing permit boundaries and forest plan allocations are not in conflict with desired conditions provided through the final rule and address one of the State-specific concerns" Colorado identified. *Id.* The Service emphasized, however, that the 2012 Colorado Rule does not constitute approval of any future ski-area expansions; such expansions remain subject to "site-specific environmental analysis, appropriate public input, and independent approval." *Id.*

**B.**

In 2003, Intervenor Aspen Skiing Company sought permission from the Service to construct a trail for skier egress from Burnt Mountain, the easternmost portion of the Snowmass Ski Resort. The Company sought to build the egress trail across part of an eighty-acre portion of Burnt Mountain that the Service previously had inventoried as roadless. Plaintiff Ark Initiative challenged the Service's Environmental Assessment for that project under NEPA and prevailed before the agency on the ground that the assessment failed to analyze the project's anticipated impact on the area's

roadless characteristics. In August 2013, after promulgating the 2012 Colorado Rule, the Service completed a new Environmental Assessment for the proposed Burnt Mountain trail. The Service explained that the 2012 Colorado Rule had removed the roadless designation from the acreage at issue because it was within the boundaries of an existing ski-permit area, but nonetheless considered whether the trail would affect the area's roadless characteristics and determined that it would not. *See* Snowmass Ski Area Environmental Assessment for the Burnt Mountain Egress Trail (Aug. 2013) at 3-18 to 3-20, J.A. 675-77. In particular, the Service determined that other applicable standards and guidelines adequately would protect the area's soil, water, and air resources, and its plant and animal diversity, among other features. In September 2013, the Service approved the egress trail project, concluding that the Environmental Assessment sufficed, so no Environmental Impact Statement (EIS) was warranted, and again noting that the area at issue is no longer "located in [a] designated inventoried roadless area." 2 Burnt Mountain Decision Notice and Finding of No Significant Impact (Sept. 2013) at RTC-5, J.A. 759. Ark appealed that decision within the agency, and the Service affirmed.

Ark Initiative and another environmental organization, Rocky Mountain Wild, and two individual plaintiffs who frequent Burnt Mountain to enjoy its aesthetic and recreational qualities (together, Ark or the plaintiffs) challenged the Service's decision in federal district court under the Wilderness Act, NEPA, and the APA. As relevant to this appeal, Ark alleged that the Service's application of the 2012 Colorado Rule to the egress-trail proposal was arbitrary and capricious and in violation of agency policy because the Service had conducted no site-specific inquiry into the area's on-the-ground conditions before excluding it from the roadless inventory. If the Service had acknowledged the

relatively undeveloped character of the Burnt Mountain acreage, Ark asserted, the Service would have been required by its own policy to keep the acreage in the roadless inventory. Ark also contended that, by failing to send it individualized notice of the proposed 2012 Colorado Rule, the Service violated NEPA's notice requirements.

On August 18, 2014, the District Court granted summary judgment to the Service and the Company, denying Ark's cross-motion. *Ark Initiative*, 64 F. Supp. 3d at 110. The court concluded that the Service proffered sufficient justifications for the ski-area exclusion: facilitating recreational use of the land; assisting Colorado's ski industry, an important source of revenue for the State; reducing land-management conflicts and confusion for the ski industry; responding to a request by the State; removing degraded areas from the roadless inventory; and making only a minor impact on the State's overall roadless management. *Id.* at 102-04. The Service had not deviated from its roadless policy in the manner Ark contended, the court explained, because even if the agency handbook on which Ark relied governed roadless inventorying as well as wilderness designation (the Service contends it does not), the Handbook explicitly applies only to placement in the inventory of roadless or potential wilderness lands, not to ongoing management of that inventory. *Id.* at 104-05. The court also rejected the contention that Ark was entitled to individualized notice of the 2012 Colorado Rule and related NEPA proceedings, highlighting that the Service went to great lengths to notify and involve the public in its six-year decision-making process for the rule and received approximately 312,000 public comments. *Id.* at 109-10. The plaintiffs timely appealed to this court.

12

## II.

## A.

The question before us is of a type ubiquitous to administrative law:  Whether the Colorado rule is permissible under federal law, not whether we believe as a matter of environmental policy it is the best rule, or even a good one. We review *de novo* the District Court's grant of summary judgment and may affirm on any ground properly raised and supported by the record.  *See Ark Initiative v. Tidwell*, 749 F.3d 1071, 1074 (D.C. Cir. 2014).

Ark challenges the 2012 Colorado Rule under the APA as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The scope of judicial review under the arbitrary-and-capricious standard "is narrow and a court is not to substitute its judgment for that of the agency," but the court must confirm that the agency has fulfilled its duty to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  A reviewing court may not "supply a reasoned basis for the agency's action that the agency itself has not given."  *Id.* (quoting *SEC v. Chenery Corp*., 332 U.S. 194, 196 (1947)).  But a court

"will . . . 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc*., 419 U.S. 281, 286 (1974)).

The 2012 Colorado Rule in general, and its ski-area exclusion in particular, reflect a change in agency policy, as the Service acknowledged in promulgating the rule. The Service stated that the new, State-specific rule "adjusted roadless area boundaries from the 2001 inventory" in several ways, such as by "[e]xcluding ski areas under permit or lands allocated in forest plans to ski area development." 77 Fed. Reg. at 39,576. The agency, for the first time, made a "state-wide policy decision that roadless areas not overlap with ski areas," and accordingly removed the 8,300 qualifying acres from the roadless inventory. *Ark Initiative*, 749 F.3d at 1077.

Where an agency changes a policy or practice, it "is obligated to supply a reasoned analysis for the change." *State Farm*, 463 U.S. at 42. But no specially demanding burden of justification ordinarily applies to a mere policy change. *See FCC v. Fox*, 556 U.S. 502, 514-16 (2009). An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.* at 515. When a "new policy rests upon factual findings that contradict those which underlay its prior policy," however, an agency must offer a "more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* As discussed below, no elevated burden of justification applies to the Service's decision because, in approving the 2012 Colorado Rule, the Service made no new factual findings contradictory to those

supporting the nationwide 2001 Roadless Rule. Consistent with the holding of the district court, and contrary to Ark's contention, we conclude that the agency's decision was valid and non-arbitrary.

The Service lawfully exercised its "broad discretion to determine the proper mix of uses permitted within [national forest] lands." *Wyoming*, 661 F.3d at 1268. There is no question that the Service's decision to include in its management of Colorado's forests some limited accommodation of recreational skiing, together with new, offsetting environmental protections, is permissible under the multiple-use mandates reflected in the Organic Act, the Multiple-Use Sustained-Yield Act, and the National Forest Management Act. *See, e.g.*, 16 U.S.C §§ 528-529 (requiring administration of National Forest System lands for multiple uses, including recreation); *id.* § 1604(e)(1) (requiring forest plans to accommodate multiple uses, including recreation). Those statutes simply do not constrain the Service's discretion to shift its designation and treatment of once-inventoried roadless lands, as it did in approving the 2012 Colorado Rule. Indeed, "[n]othing in th[e] [National Forest Management Act] or any other federal statute obligates the Forest Service to manage inventoried roadless areas as a distinct unit of administration or resource value." *Lockyer*, 575 F.3d at 1006.

More to the point, the Service's explanation for its policy change passes muster under the APA. The Service based its decision on Colorado's expressed interests in regulating "long-term management of [Colorado's inventoried roadless areas] to ensure roadless area values are passed on to future generations, while providing for Colorado-specific situations and concerns that are important to the citizens and economy of Colorado." 77 Fed. Reg. at 39,577; *see also id.* at 39,590.

The record supports the Service's concern that on-the-ground management conflicts could arise at the boundaries of roadless lands and ski areas, and the Service reasonably relied on the importance of recreational skiing to Colorado's economy. It noted that ski areas sited in part on public lands managed by the Service attract millions of skiers a year, and that Colorado skiers spend about a third of the approximately $8 billion in tourist dollars the State attracts annually. 77 Fed. Reg. at 39,578. A relatively small number of acres subject to overlapping roadless and ski-area designations under the 2001 Roadless Rule affected thirteen ski areas, the Service explained, and the exclusion aims to avoid management conflict and confusion resulting from that dual designation. *Id*.

The marginal and limited character of the boundary adjustment helped to justify the Service's treatment of it. The ski-area exclusion applies to only 0.2% of all previously inventoried roadless areas in the State, thus on the whole only minimally affecting Colorado's roadless acreage. *Id.* Approximately 6,600 of those 8,300 acres had already been grandfathered under special-use permits exempting them from roadless-area development prohibitions, whether in the 2012 Colorado Rule, *see* 36 C.F.R. § 294.48(a), or the 2001 Roadless Rule, *see* 36 C.F.R. § 294.14(a), *invalidated by* 70 Fed. Reg. 25,654 (May 13, 2005), *reinstated by Cal. ex rel. Lockyer*, 575 F.3d at 1020-21. It was thus only the remaining 1,700 overlapping acres, zoned for skiing under forest plans but not covered by special-use permits, which—but for the challenged ski-area exclusion—would have been subject to the full protections against roadbuilding and timber removal associated with roadless designation. *See* 77 Fed. Reg. at 39,594. The Service determined that the limited overlap, which may have been the inadvertent result of imprecise mapping, could hamper ski-area maintenance and expansion.

Importantly, and also contrary to Ark's contention, the Service addressed how the rule taken as a whole would fulfill the Service's conservation mandate. The 2012 Colorado Rule contains increased protections in the form of new acreage added to the State's roadless inventory, and a new and more restrictive upper-tier designation for some roadless lands. Those provisions were included to "offset the limited exceptions for Colorado-specific concerns so that the final rule is more [environmentally] protective than the 2001 Roadless Rule." *Id.* at 39,578.

The Service's reasoning that the excluded acreage "include[s] roadless acres with degraded roadless area characteristics due to the proximity to a major recreational development," *id.*, does little to aid our review, because it lacks a factual basis in the record, and the Service's invocation of that rationale is ambiguous at best. The agency has made no attempt to identify the location, scope, or degree of any such degradation within the ski-area exclusion. Indeed, elsewhere in its preamble to the 2012 Colorado Rule, the Service asserted that the rule excludes other lands that have been "substantially altered *and* 8,300 acres for ski area management," suggesting that the 8,300 ski-area acres at issue were not among the acres removed on the basis of their degraded condition. *Id*. at 39,577-78 (emphasis added). The lack of any clear showing of degradation is of no moment, however, as the balance of the Service's reasoning adequately supports the challenged exclusion.

Colorado's concern for aligning the boundaries of ski areas and roadless acreage, the relatively small amount of land affected by the ski-area exclusion, and the rule's substantial offsetting measures provide sufficient, non-arbitrary grounds for the rule. We need not accept the bare fact that "the State of Colorado asked for it" as sufficient

justification for the ski-area exclusion, Br. of Federal Appellees 20, because Colorado is well situated to identify factors supporting desirable combinations of forest-land use within its borders and has done so here. The reasons the Service has provided for accepting Colorado's proposal need not be "so precise, detailed, or elaborate as to be a model for agency explanation" in order for us to hold that they are "the sort of reasons an agency may consider and act upon." *Fox*, 556 U.S. at 538 (Kennedy, J., concurring in part and concurring in the judgment).

Invoking the Ninth Circuit's recent *en banc* decision in *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956, 959 (9th Cir. 2015), Ark accuses the Service of an unjustified about-face in its factual assessment. Ark argues that the Service opted in the 2001 Roadless Rule not generally to exempt ski areas and therefore was required when it exempted ski-area acreage from the 2012 Colorado Rule to "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Fox*, 556 U.S. at 515. We disagree. To begin with, *Kake* is not binding on this court, and we take no position here on whether we agree with that decision. In any event, as noted above, *Fox* demands enhanced justification where a policy change rests on factual findings that contradict the facts undergirding the prior policy, circumstances not present here. *Id.* The rule at issue in *Kake* created an exemption from the national 2001 Roadless Rule for the 16.8 million acre Tongass National Forest that the prior rulemaking had specifically considered and rejected, and it did so by making new, contradictory factual findings without any additional environmental analysis or material change in "the overall decisionmaking picture." 795 F.3d at 962 (internal quotation marks and citation omitted); *see id.* at 959-60. The 2012 Colorado Rule, in contrast, was based on an entirely new record, including a new EIS, and supported

with new, State-specific findings. None of the Colorado findings conflicts with the findings underlying the nationwide 2001 Roadless Rule, which looked at "the 'whole picture' regarding the management of the National Forest System," 66 Fed. Reg. at 3246; *see id.* at 3246-48, and which, the Service even then acknowledged, could affect states differently, *id.* at 3264. No enhanced justification was required for the Service's State-specific ski-area exclusion. *Cf. Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037-38 (D.C. Cir. 2012) (more detailed justification is unnecessary where "petitioners cannot point to any new findings, let alone contradictory ones, upon which EPA relied").

Ark further contends that the Service acted arbitrarily because, Ark asserts, it deviated from the inventory criteria embodied in chapter 70 of its Land Management Planning Handbook by adopting the ski-area exclusion without regard to the affected areas' on-the-ground conditions. *See* Chapter 70, FSH 1909.12 Land Management Planning Handbook (2007 Handbook), J.A. 300-31; *see National Forest System Land Management Planning Directive for Wilderness Evaluation*, 72 Fed. Reg. 4478 (Jan. 31, 2007). Ark contends that the Service's decisions regarding management of roadless areas must be determined solely by "objective criteria" specified in the Handbook. Br. of Appellants 40. Those criteria, which appear to derive from the Wilderness Act's inventorying directive to a different agency responsible for national park land, *see* 16 U.S.C. § 1132(c), require the inventorying of any area that contains no forest roads, "contain[s] 5,000 acres or more," or is at least: contiguous to existing wilderness; a self-contained ecosystem; or subject to preservation "due to physical terrain and natural conditions," 2007 Handbook at 16-17, J.A. 302-03. The Service must inventory and manage as roadless any land that fits that

objective description, Ark suggests, and it violated the APA by failing to do so here.

Ark's contentions are off-base, however, because—consistent with the Wilderness Act, 16 U.S.C. § 1132(c)—the Handbook by its own terms applies not to management of roadless inventory, but to the Service's initial inventorying of potential wilderness areas. Chapter 70 of the Handbook, entitled "Wilderness Evaluation," begins by stating that it "describes the process for identifying and evaluating potential wilderness," not any standards for conserving and managing roadless areas. 2007 Handbook at 15, J.A. 301. Ark's confusion likely stems from the fact that the Service identified much of today's roadless inventory as part of its effort under the Wilderness Act to compile a list of potential wilderness areas. *See Wyoming*, 661 F.3d at 1221-22. The "inventory of potential wilderness," the Handbook explains, is "completed with the express purpose of identifying all lands that meet the criteria for being evaluated for wilderness suitability." 2007 Handbook at 15-16, J.A. 301-02.

The Handbook itself seeks to clarify the Service's nomenclature: "Areas of potential wilderness identified through this [inventorying] process are called potential wilderness areas." *i.e.*, not roadless inventory. *Id.* at 15, J.A. 301. "This inventory of potential wilderness is not a land designation, nor does it imply any particular level of management direction or protection in association with the evaluation of these potential wilderness areas." *Id.* In adopting the current version of the Handbook in 2007, the Service took further pains to spell out that "the term 'potential wilderness areas' is used to avoid confusion with the term 'inventoried roadless area' used in the Roadless Area Conservation Rule. . . . The Roadless Area Conservation

Rule definition is different from the criteria for 'potential wilderness areas.'"  72 Fed. Reg. at 4478.

Ark nevertheless urges that the Handbook, at least as the Service has applied it, does not mean what it says.  Ark emphasizes in particular the Service's mention of the Handbook in its response to comments on the proposed 2012 Colorado Rule.  Some commenters questioned the Service's denial of the oil-and-gas industry's request for an exclusion of acreage with high oil-and-gas development potential, while others questioned the Service's failure to prohibit oil-and-gas leasing altogether.  *See* 77 Fed. Reg. at 39,588.  Ark highlights that, in response to such comments, the Service stated:  "Roadless inventory procedures follow Forest Service Handbook 1909.12, Land Management Handbook procedures.  Whether or not an area is identified as having high mineral potential is not an inventory criterion." *Id.*  Ark contends that the Service thereby applied the Handbook to "preclude[]" an exclusion for oil-and-gas lands, and similarly should have denied the ski-industry exclusion.  Br. of Appellants 49.

The Service permissibly reads its own statement differently than does Ark, as a description of the background factors that bore on its initial inventorying of lands as roadless.  The presence of lands in the roadless inventory, the 2012 Colorado Rule preamble points out, simply did not depend on facilitating or prohibiting oil-and-gas development, and it was against that backdrop that the Service defended its decision to leave existing oil-and-gas leases largely undisturbed, neither supplementing leasing rights by excluding oil-and-gas-rich lands from roadless inventory, nor invalidating existing leases in the name of strengthening environmental protection of roadless lands.  In light of the record and the deference we owe to the Service, we cannot credit Ark's claim of a "longstanding agency policy and

practice" reflected in the Handbook that "preclude[s]" or "foreclose[s]" the Service from removing the ski area lands from roadless inventory. Br. of Appellants 49, 51.

Ark further contends that the Service arbitrarily distinguished between similarly situated industries because it granted ski-area boundary adjustment sought by the State while denying the oil-and-gas industry's requested exclusions. The record shows otherwise. The Service recognized that the ski-area boundary adjustment affected only 8,300 acres of land. 77 Fed. Reg. at 39,578. The oil-and-gas industry's requested exclusion, in contrast, would have removed at least 150,000 acres from the roadless inventory. *See* 1 Final EIS 2012 Colorado Rule at 85, J.A. 431 (listing leased oil-and-gas lands within Colorado's inventoried roadless areas); *see also* 77 Fed. Reg. at 39,578 (noting that there are nearly 900,000 acres classified as having high or moderate-to-high oil-and-gas potential within Colorado's inventoried roadless areas). The Service credited the offsetting protections of the 2012 Colorado Rule as a factor in the acceptability of the ski-area exclusion, 77 Fed. Reg. at 39,578, but those added protections would have been dwarfed by the scope of the requested oil-and-gas exclusion. Accordingly, the Service's decision to exclude from the roadless inventory marginal portions of designated ski areas, but not vast swaths of oil-and-gas lands, was not arbitrary and capricious.

## B.

Ark and the two individual plaintiffs also contend that, by failing to send them individualized notice of the rulemaking and NEPA proceedings relating to the 2012 Colorado Rule, the Service violated NEPA's scoping regulations, 40 C.F.R. §§ 1501.7(a)(1), 1506.6(b)(1)-(3). As the District Court aptly recounted, both Colorado and the Service made "impressive

efforts to reach out to the public as it worked out the contours of the Colorado Rule." *Ark Initiative*, 64 F. Supp. 3d at 110. Those efforts included: five formal public-involvement processes, generating 312,000 public comments; the creation of a bipartisan task force in Colorado which held more than a dozen meetings and considered more than 40,000 public comments; publication of numerous notices in the Federal Register; and three open meetings of the Roadless Area Conservation National Advisory Committee. *See* 77 Fed. Reg. at 39,581. It is difficult to see how any person or organization with more than a passing interest in the rulemaking could have missed a chance to participate.

Ark's claim that it was entitled to individualized notice falls short because none of the cited regulations demands any such notice to entities in Ark's circumstances. Section 1501.7(a)(1) provides that, in determining the scope and significance of issues to be addressed in a NEPA process, an agency "shall . . . [i]nvite the participation of" various affected governments, agencies, and entities, as well as "other interested persons (including those who might not be in accord with the action on environmental grounds)." 40 C.F.R. § 1501.7(a)(1). Ark argues that its successful administrative challenge to the Environmental Assessment for the Burnt Mountain egress trail in 2006, which turned on the agency's failure to evaluate the area's roadless characteristics, rendered it an "interested" person under § 1501.7(a)(1) with the same rights as the plaintiff in *Northwest Coalition for Alternatives to Pesticides v. Lyng*, 844 F.2d 588 (9th Cir. 1988). But, as the District Court recognized, *Ark Initiative*, 64 F. Supp. 3d at 109, Ark's partial and local administrative victory concerning development on a single parcel of roadless land, years before the Service's state-wide rulemaking, is a far cry from the interest of the plaintiff organization in *Lyng* "as a litigant earlier in th[at] action"—the very action that

successfully mandated the new EIS of which the organization sought notice. *Lyng*, 844 F.2d at 595. Were we to accept Ark's sweeping claim that NEPA requires the Service "to give personal notice to *any* interested parties of *any* decision that will affect their interests, irrespective of whether such entities have ever previously litigated over the decision in question," Brief of Appellants 63, NEPA proceedings would regularly, and often senselessly, be derailed for lack of notice.

Section 1506.6 provides that agencies "shall mail notice" of NEPA proceedings both "to those who have requested it on an individual action," 40 C.F.R. § 1506.6(b)(1), and to "national organizations reasonably expected to be interested in the matter," *id.* § 1506.6(b)(2), and that notice "may" be given in various ways to specified types of potentially interested groups or individuals for actions "with effects primarily of local concern," *id.* § 1506.6(b)(3). By its terms, section 1506.6(b)(1) only applies to requested notice about "an individual action," and not to open-ended requests for notice of any actions that could in any way affect a given plot of land, such as the general request Ark purports to have made here with respect to Burnt Mountain. Ark has made no showing that it qualifies as a national organization under section 1506.6(b)(2) or that it falls within the few categories of entities listed in section 1506.6(b)(3), which for the most part does not contemplate individualized notice in any event. The Service's failure individually to invite Ark to participate in NEPA or rulemaking proceedings thus did not run afoul of any NEPA notice requirement.

\* \* \*

For the foregoing reasons, we affirm the judgment of the District Court.

*So ordered.*